Concur—Sullivan, J. P., Ross, Carro, Milonas and Wallach, JJ.

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LARRY ROBINSON, Appellant.—Judgment, Supreme Court, New York County (Paul Bookson, J.), rendered on April 9, 1984, unanimously affirmed.

Application by appellant's counsel to withdraw as counsel is granted. *(See, Anders v California,* 386 US 738; *People v Saunders,* 52 AD2d 833.) We have reviewed this record and agree with appellant's assigned counsel that there are no nonfrivolous points which could be raised on this appeal. Concur—Sullivan, J. P., Ross, Carro, Milonas and Wallach, JJ.

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ENRIQUE SANTIAGO, Appellant.—Judgment, Supreme Court, Bronx County (Rena Uviller, J.), rendered on June 12, 1984, unanimously affirmed.

Application by appellant's counsel to withdraw as counsel is granted. *(See, Anders v California,* 386 US 738; *People v Saunders,* 52 AD2d 833.) We have reviewed this record and agree with appellant's assigned counsel that there are no nonfrivolous points which could be raised on this appeal. Concur—Sullivan, J. P., Ross, Carro, Milonas and Wallach, JJ.

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PETER RUKAJ, Appellant.—Judgment, Supreme Court, Bronx County (Richard Lee Price, J.), rendered April 30, 1985, which convicted defendant, after jury trial, of burglary in the third degree and sentenced him to a prison term of 1⅓ to 4 years, reversed, on the law, and the matter remanded for a new trial.

Prior to sentence, defendant moved to set aside the jury verdict pursuant to CPL 330.30 on the grounds that during the course of the jury's deliberations a court officer made unauthorized communications to a juror and also that the jury deliberations were tainted by racial bias. The application was supported by the affidavit of a juror, Diane Diaz, in which she recounted that a particular court officer stated to her in a voice loud enough for other jurors to hear that if there was not a verdict the jury might be sequestered for the entire weekend or perhaps five or six weeks. The Diaz affidavit also alleged various instances wherein considerations of racial bias infiltrated the jury's deliberations and stated that a note was

sent to the Judge during the course of deliberations, informing him that the jury was unable to reach a verdict due to racial prejudice and speculation. In the affidavit, Ms. Diaz also claimed that she was forced to relinquish her position for acquittal because of the coercion of the court officer's remark and the racially motivated pressure that other jurors had placed on her.

The Judge granted the motion to the extent of ordering a hearing to investigate the "intrusion" of the court officer's communication. The motion was denied with respect to the claimed ground of racial bias.

At the hearing, Ms. Diaz testified as to the circumstances of the court officer's communication, which she indicated took place after the jury had deliberated vigorously for two days and was still deadlocked when the jurors repaired to dinner at about 7:00 P.M. on the second evening, a Friday. She testified that while being escorted to or from the restaurant, she asked one of the attending court officers how long deliberations would continue if the jury could not reach a verdict and that the court officer replied that the jury would be sequestered for the weekend and then went on to state that a jury could be sequestered for as long as five or six weeks before a mistrial would be declared. It was shortly thereafter that evening, at 9:36 P.M. that the jury returned its unanimous guilty verdict.

We initially note that court officers are prohibited by statute (CPL 310.10) and case law *(Parker v Gladden,* 385 US 363; *People v Ciaccio,* 47 NY2d 431) from communicating with jurors unless authorized by the court or when performing administrative duties. The Trial Judge made no findings on the issue of what remarks were, in fact, made by the court officer. If Ms. Diaz's testimony is accepted in that regard, the court officer's remarks were not only highly inappropriate but, in light of the jury's relatively quick turnaround in reaching agreement, these remarks could be seen as having influenced the verdict by prejudicially suggesting that the jury reach an agreement or be subject to extended sequestration. *(People v Perfetto,* 96 AD2d 517; *People v Eadie,* 83 AD2d 773; *People v Cadby,* 75 AD2d 713; *cf. People v Horney,* 112 AD2d 841, 844.) This is persuasively demonstrated by the testimony, at the posttrial hearing, of the juror to whom the remarks were made indicating that, at the very least, she voted for conviction because of her concern about a lengthy sequestration even though she still believed the defendant to be not guilty.

For this reason the conviction must be reversed and the matter remanded for a new trial.

Note must also be taken of a further issue of deep concern that has been raised here by allegations that racial bias permeated this jury's deliberations, allegations which, if proven true, would also require reversal. The trial court summarily denied the motion to set aside the verdict on this ground without a hearing or other appropriate inquiry into this most serious charge made under oath.

While the posttrial hearing to set aside the verdict was limited to the matter of the court officer's remarks, in the course of that hearing Ms. Diaz, herself a member of a minority group, testified with concern and disquietude about what she perceived as deeply rooted racial bias permeating the jury's deliberations. The jury here was composed entirely of blacks and Hispanics and the two arresting police officers who testified for the People were black, while the defendant and the defense attorney were white.

The dissenting juror testified as to the extremely heated nature of the deliberations. Chairs were "shuffled about" and one was even thrown at her. (Cf. *People v Lavender,* 117 AD2d 253; *People v Jacobson,* 109 Misc 2d 204, *affd* 89 AD2d 826.) There was "static" and "violence", and some of the jurors cursed at her and harassed her. According to her testimony, the reasons for this harassment appeared to be predicated upon the fact that she didn't "look at people by color, race, or ethnic background" while other members of the jury repeatedly expressed their prejudice against defendant and his counsel by virtue of their race and exhorted the other jurors to vote for conviction on this basis alone. She asserted that comments were made to the effect that one juror would not vote for acquittal because, "I won't let a white man [defense counsel] influence or manipulate me and I won't do it" and, "we as blacks should not allow 'whitey' to win out".

Apparently the jury was so troubled over this issue that it sent a note to the court indicating that it could not reach a verdict "because of speculations and biased feelings". After this note was read, defense counsel requested a mistrial. The court denied this request and also a request to conduct further inquiry. Instead, the court further highlighted the racial issue by a supplemental charge which was insufficient to appropriately address the issue.

At this point, the Trial Judge should have conducted an inquiry into the nature of the jury's "speculations and biased feelings". The court had a clear obligation to respond to the jury note and at that juncture should minimally have questioned the jurors. (*People v Lavender, supra.*)

The fact that the jury sent this note is supportive of the fact that the allegations of Ms. Diaz were not mere afterthoughts or second guesses, raised post hoc by a disaffected juror. The long-standing rule that a jury verdict should not be impeached, absent special circumstances, by affidavit or testimony of jurors after their verdict is publicly returned is intended to protect jurors from being harassed after verdict and to ensure the secure foundation of the verdict. *(See, e.g., People v De Lucia,* 20 NY2d 275.) Here, it appears that the jury's concern about biased feelings was not an afterthought but the note evidences that the concern was present at the time of deliberation.

As we recently noted in *People v Lavender (supra),* in distinction to the rule that statements by jurors may not ordinarily be used to impeach a verdict once the jury has been discharged, when the juror's concern is transmitted to the court prior to report of the verdict the issue should be investigated.

CPL 330.30 provides that a jury verdict may be set aside, upon motion of the defendant, *inter alia,* on the ground of improper conduct by a juror which may have affected a substantial right. While, as a general rule, statements by the jurors themselves may not be used to impeach a verdict and the court may not inquire into the mental processes of deliberation *(e.g., Stein v New York,* 346 US 156, 178; *People v Brown,* 48 NY2d 388), there is an exception to the rule where there has been an improper outside influence on jury deliberations. *(Supra.)* When these outside influences impair the impartial assessment of the facts by the jury, and thus constrain defendant's fundamental right to a fair trial, reversal is warranted. *(People v Phillips,* 87 Misc 2d 613, *affd* 52 AD2d 758, *lv denied* 39 NY2d 949.)

Accordingly, when the spectre of an outside influence of the jury affecting defendant's fundamental right to a fair trial is raised, it is vital that a hearing or other appropriate inquiry be held to ascertain what actually transpired. *(See, People v Phillips, supra; People v Horney, supra; People v Morales,* 121 AD2d 240, 243 [Fein, J., dissenting].) At such hearing or inquiry, Ms. Diaz could be examined and cross-examined closely as to the validity of her allegations. Moreover, the People and the other jurors could have an opportunity to respond. *(See, People v De Lucia, supra.)*

If, after thorough examination, Ms. Diaz's claim that she was coerced into abandoning her position for acquittal by

reason of another juror's harassment survives scrutiny and is established, it would demonstrate that invidious racial bias and prejudice permeated this jury's deliberations so as to deprive this defendant of a fair trial. When a juror manifests any bias or prejudice towards a defendant because of race, creed or color, that juror is unable to return an impartial verdict and would be disqualified for cause at the outset if challenged. *(People v Blyden,* 55 NY2d 73; *People v Leonti,* 262 NY 256.)* In cases where the jury's weighing of testimony or the prosecutor's summation depends on the racial origin of the witness, the verdict must be set aside. *(E.g., People v Green,* 89 AD2d 874; *People v Hearns,* 18 AD2d 922.)* A jury verdict influenced by prejudice and tainted by racial bias was set aside in *People v Whitmore* (45 Misc 2d 506). The scourge of racial prejudice, toward any group, which impugns a jury's ability to impartially assess the evidence, constitutes a corrupt outside influence which cannot be sustained.

In passing, we would note that appellant also complains that the Assistant District Attorney violated the "unsworn witness rule" in making certain personal references during her questioning of the witnesses. While we find that certain of these remarks may better have been left unsaid, they stemmed from efforts to elicit the facts of an unusual incident arising in the course of court proceedings and provide no basis for a reversal *(People v Ortiz,* 54 NY2d 288), particularly since it was defense counsel who unduly emphasized and elaborated upon the District Attorney's role in the incident. Concur— Carro, Fein, Milonas and Ellerin, JJ.

Sandler, J. P., concurs in a separate memorandum as follows: The defendant was convicted, after a jury trial, of burglary in the third degree and sentenced to an indeterminate term of imprisonment of not less than 1⅓ and not more than 4 years.

The jury's verdict was strongly, in my opinion conclusively, supported by the evidence. The defendant was identified by two police officers as the person they observed, at about 5:00 A.M. on January 4, 1984, emerging from under a partially opened security gate of a burglarized jewelry store at 766 Lydig Avenue in The Bronx, with a paper bag in his hand. Observing the officers, the defendant dropped the bag and ran into an alleyway leading towards Holland Avenue. A few minutes later, he was observed in a apartment building on Holland Avenue by the superintendent of the building, who subdued him after a brief struggle. On his person was a knife, identified by the owner of the jewelry store as his knife, and a

metal spike and beeper. In the brown bag dropped by the defendant were jewelry and money worth approximately $4,000.

Notwithstanding the overwhelming strength of the People's case, I am persuaded that there should be a reversal because the evidence supports the inference, albeit marginally, that there had been an improper communication by a court officer to a juror that could have affected that juror's discharge of her duties. That issue, involving sharply conflicting testimony, is a close one, and merits detailed analysis.

I do not agree with the other grounds assigned in the court's memorandum for reversal, believing that these embody erroneous legal conclusions reached in part on the basis of an incorrect interpretation of relevant parts of the record. Because these additional grounds involve policy questions of broad importance, a discussion of the issues presented is appropriate even though I am in agreement with the court's determination of the appeal.

On the basis of what seems to me a tenuous and clearly insufficient factual foundation, the court has assigned as error the Trial Judge's adherence to a long-established principle, apparently never previously departed from by any appellate court in this State, that a jury verdict may not be impeached on the basis of a juror's claims of misconduct during jury deliberations except where those deliberations were affected by external influences. (*Stein v New York,* 346 US 156, 178; *McDonald v Pless,* 238 US 264, 267-268; *Dalrymple v Williams,* 63 NY 361; *People v Sprague,* 217 NY 373; *People v De Lucia,* 15 NY2d 294; *People v De Lucia,* 20 NY2d 275, 279; *People v Brown,* 48 NY2d 388, 393; *People v Smith,* 87 AD2d 357.)

In addition, the court's memorandum assigns as a ground for reversal the Trial Judge's failure to respond to a jury communication by interrupting the jury deliberations to conduct an inquiry never requested by defense counsel into whether jurors had manifested racial bias during the deliberations, although the communication never alleged such racial bias and was almost certainly not intended to convey any such claim. Even if the communication had the meaning given to it in the court's memorandum, and even if the trial court should reasonably have so construed it, the response recommended in the court's memorandum would have been improvident under the circumstances, the potential for harm to the deliberative process in the proposed inquiry clearly outweighing any constructive result that could reasonably have been expected.

Analysis of the issues presented appropriately starts with the defendant's motion pursuant to CPL 330.30 to set aside the jury verdict based upon an affidavit by one of the jurors, Diane Diaz. In the affidavit, she stated that at about 7:00 or 7:30 on the evening of the second day of deliberations a court officer "stated that if there was not a verdict the jury might be sequestered for the entire weekend and that he has experienced cases where a jury was sequestered for five to six weeks."

In addition, she stated that at a point during the deliberations when "almost the entire jury was voting for an acquittal", one of the jurors, described by her as a black female, "began to attack the defense case from a racially militant posture." She said that this juror began to "racially intimidate the spanish jurors by telling them what they are letting 'whitey' [meaning defense counsel] manipulate their minds and that in words of substance 'we as blacks should not allow "whitey" to win out.' "

The affidavit went on to assert: "The issues then did not become one of whether or not the people had proven their case beyond a reasonable doubt; but the issues then became one of whether or not a white attorney should be permitted to cloud the testimony of two young black police officers and oppose the People's version of the evidence as presented by a female black prosecutor."

In a thoughtful opinion, the trial court granted the motion to the extent of directing a hearing with regard to the claimed communication from the court officer, and denied it with respect to the claims of racial bias in accordance with the general principle that precludes any inquiry into jury deliberations to impeach a jury's verdict except to the extent to which the deliberations reflected outside influences.

In the hearing that followed with respect to the court officer's communication, Ms. Diaz in substance reaffirmed the statement in her affidavit that on the evening of the second day of deliberations, shortly before the verdict was announced, she asked a court officer how long the jury would be kept if the jurors were unable to agree, and was told that the jurors would be sequestered for the weekend, and, at the Judge's discretion, could be held for up to five to six weeks. She testified that this conversation occurred during a dinner break while the jurors were either going to or coming from dinner.

In response, a court officer testified that on the evening of the first day of deliberations when the jury was going out to

dinner, Ms. Diaz asked him what would happen if they did not come to a decision that night, and he responded that they would be sequestered in a hotel, and that their families would be notified. He denied having made any statement with regard to the jurors being sequestered for a further period of time.

If the event occurred as testified to by the officer, it seems clear that no basis for reversal would have been presented. (See, People v Horney, 112 AD2d 841.) Although the comment may well have been ill advised, the fact is that it could not possibly have affected the juror's discharge of her duties since all of the jurors had been informed during the voir dire that in the event of disagreement they might be sequestered overnight, and in accordance with well-known and familiar practice, the captain of the court officers had advised the jury the night before the case was submitted that they should consider preparations in the event that a disagreement occurred requiring sequestration. The critical question, of course, is whether or not the officer made the further remark attributed to him by the juror. Since that factual issue was not directly determined by the trial court in his denial of the motion for a new trial, it necessarily becomes an issue for this court to consider.

In evaluating the issue of credibility presented, it seems to me apparent from an examination of the minutes that Ms. Diaz appears as a sincere person with, however, so insecure a recollection of the relevant events as to give rise to a serious question, not as to her truthfulness, but as to her reliability.

Illustratively, Ms. Diaz was emphatic that the conversation she testified to took place on the second day of deliberations while the jurors were either going to or coming from dinner. However, the trial transcript is clear that the jury did not go out to dinner on the second evening, and the conversation either could not have taken place on that evening or could not have taken place under the circumstances described by the juror. In light of the court officer's testimony, and in the absence of any plausible explanation as to how the conversation could have taken place except during a dinner break, it seems free from any serious doubt that the conversation in fact took place during the dinner break on the first day. A fundamental error of this kind by the witness is not lightly to be discounted in evaluating her reliability.

In this connection, I am unable to understand the apparent acceptance in the court's memorandum of Ms. Diaz's testimony as to the date on which the conversation took place, in

light of the conclusive refutation of that testimony clearly disclosed in the record.

In addition, in her affidavit Ms. Diaz had asserted that there was a time during which "almost the entire jury was voting for an acquittal." However, under questioning by the District Attorney Ms. Diaz ultimately acknowledged that on the first ballot that was taken on the first day of deliberations, the vote was 10 to convict and 2 to acquit. Indeed, in a question by the District Attorney that was not answered because of a misunderstanding by the juror, but which question was clearly based on what the District Attorney had been told by other jurors after the verdict had been reached, it was indicated that by 6:00 P.M. on the first day of the deliberations the vote was 11 to 1 to convict. The record discloses no meaningful explanation by the juror, in response to questions designed to elicit an explanation, as to how she reconciled her statement in the affidavit that almost all of the jurors were voting to acquit with her acknowledgment that the first vote was overwhelmingly for conviction.

Notwithstanding these clear indications that the juror's memory of the relevant events was seriously confused, I do not believe that her failures of memory would extend to recalling a comment of the kind that she attributed to the court officer if it had not been made in some form, nor do I believe that this witness gave intentionally false testimony. As against that, there is the reality that a court officer who imprudently made a foolish remark under the relaxed circumstance of a dinner break may well have been reluctant to acknowledge what he had said. On balance, therefore, I believe that the weight of evidence confirms that the improper remark was made and that there is at least some reason to believe that it may have contributed to the juror's determination to acquiesce in the final verdict of guilty. *(Cf. People v Ciaccio,* 47 NY2d 431.)

As already observed, the trial court ruled in accordance with a long-established principle of law when he denied a hearing on the claim that the jury deliberations were affected by racial bias. As early as 1875, in *Dalrymple v Williams* (63 NY 361, 363, *supra),* the Court of Appeals observed that the rule was well established and rested on "well understood reasons of public policy as connected with the administration of justice". Indeed, I am aware of no appellate decision in this State, nor is any identified in the majority memorandum, that has departed from the principle that precludes impeachment of a jury's verdict on the basis of allegations by a juror of

misconduct in the course of jury deliberations except where the deliberations were affected by external or outside influences.

The "well understood reasons of public policy" referred to in *Dalrymple (supra)* have been described in varying words by different courts. Perhaps the classic statement is that set forth by the United States Supreme Court in *McDonald v Pless* (238 US 264, 267-268, *supra)*: "But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took park in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference."

No doubt there are few rules, however well established and supported by considerations of public policy, that may not appropriately yield to an exception under circumstances sufficiently compelling to invoke a countervailing policy. The notion that a person was convicted of a crime because of racial bias on the part of jurors is so disquieting that I am not prepared to exclude the possibility that there might occur a threshold showing of such an event so persuasive as to justify a narrow, carefully limited exception to the general rule. On any realistic evaluation, the factual showing here falls far short of that which should be required before any such exception should be considered.

Carefully considered, the Diaz affidavit clearly appears as a lawyer's document skillfully drafted to suggest far more by way of misconduct than the signer asserts factually. The single fact asserted in Ms. Diaz's affidavit is that a juror referred to defense counsel as "whitey", and urged other jurors not to permit him to "manipulate" them, or "to win out." The rest is lawyer's language, carefully framed to present conclusions as to the meaning of the deliberations without setting forth a single additional factual allegation.

The correctness of this interpretation is confirmed by a part of defense counsel's redirect examination of Ms. Diaz during the hearing. Responding to questions asked by the District

Attorney on cross-examination as to the circumstances surrounding the preparation of the affidavit, he undertook to develop from the witness what she had told him about racial bias that had led to the preparation of the affidavit. These are the questions and answers:

"Q Now, did I, at anytime, ever ask you, myself, coming from me, whether or not race had anything to do with the deliberations?

"A No, you just asked me what happened * * *

"Q Did you say to me that one of the jurors in the case told the other jurors that and referred to me as whitey throughout the deliberations?

"A Yes.

"Q How many times do you recall that I was characterized as whitey during the deliberations, if you can recall?

"A How many times, I would say, twice.

"Q And, the word manipulated, did I give you, is that something, is that a word that I created or is that something that you remember they said?

"A That's a quote from one of the jurors that I told you.

"Q That we should not allow whitey to win out?

"A Yes."

In short, what defense counsel elicited by way of explaining the genesis of the affidavit on the issue of bias was that one juror, on two occasions during the two days of deliberation, had referred to him in a hostile way as "whitey". Let me acknowledge that I do not myself claim to understand fully the significance to be attached to the use of the term "whitey" by a member of a minority community. I am sure that it is not a term of endearment, but I very much doubt that it implies anything approaching the hostile significance that we appropriately associate with other well-known ethnic references. However it be evaluated, I do not believe that this record discloses the kind of factual showing that would justify making this case the first exception by an appellate court in this State to the general rule that has heretofore prevailed.

In further assigning as a ground for reversal the trial court's failure to conduct an inquiry into possible racial bias on the part of jurors during the period of jury deliberations, the court's memorandum almost certainly misinterprets the meaning of that communication. The note in question reads as follows: "Your Honor, we the jury cannot reach a verdict on this case because of speculations and biased feelings." The

note was delivered to the court in the early afternoon of July 28, the second day of deliberations.

Even as a matter of textual analysis, it is extremely improbable that a note intended to communicate to the court the existence of racial prejudice against the defendant would have been phrased in terms of an explanation as to why the jury was unable to reach an agreement, in which the first ground assigned was "speculations", and in which the following phrase, "biased feelings", clearly adapted from admonitory comments from the trial court in his charge, included no reference to race. On the face of the communication, it has all the indicia of being a variation of the familiar communication sent by a jury in which an overwhelming majority voting one way seek to convey to the court their frustration with the apparent unreasonableness of the holdout juror or jurors, and are looking for some judicial assistance in resolving the problem.

Nothing in the colloquy between the court and counsel with regard to this communication suggests that any of them understood the message to embody the interpretation given to it in the majority memorandum. Contrary to the implicit suggestion in the majority memorandum, defense counsel did not request an inquiry into the possibility that there was racial prejudice among the jurors. Apparently interpreting the message as indicating that the jury was voting heavily to convict, he requested first that the court declare that the jury was "hung", and when that request was denied, asked the court to "inquire of the jury whether or not they feel there is any hope of reaching a verdict."

That the jury's note in fact reflected the majority's frustration at what it perceived as the unreasonable response of the holdout juror or jurors is strongly confirmed by the hearing testimony in which Ms. Diaz acknowledged that the first jury vote on the first day of deliberations was 10 to convict and 2 for acquittal.

Nor is it difficult to ascertain the meaning of the reference in the note to "speculations and biased feelings". In her testimony at the hearing, Ms. Diaz admitted that in a conversation with the District Attorney after the verdict was rendered, she had identified as the reason for her doubts as to the defendant's guilt the fact that there had been reference in testimony by a defense witness to the defendant being a businessman, and that she did not believe that a businessman would commit a burglary.

Assuming that the note had the meaning assigned to it in the majority memorandum, that the trial court should have so understood it, and that defense counsel had requested an inquiry, I think it would have been unwise for the trial court to have interrupted the jury deliberations to conduct an inquiry of the kind suggested in the court's memorandum. The potential for damage to the deliberative process inherent in such an inquiry seems to me clearly greater under the circumstances presented than any positive result that could reasonably have been anticipated.

I see no realistic way in which such an inquiry could have been conducted without intruding significantly, and in a way harmful to the deliberative process, into that which had taken place during the course of the jury deliberations. The very fact of the inquiry, wholly without regard to what might have been established in the course of it, might well have raised, in varying ways, significant impediments to any possibility that the jury could thereafter resume deliberations in an appropriate manner with any hope of reaching an agreement. The appropriate response of the trial court to such a message would surely have been a stern admonition to the jurors with regard to the significance of their oath and their obligations, reserving any further inquiry on the question until after a verdict was rendered, assuming that there was any realistic possibility that a jury in fact split by issues of racial bias could ever have reached an agreement.

Finally, I am unable to discern in the record any justification for the criticism of the Trial Assistant implicit in the "passing" reference in the court's memorandum to her having made "personal references" that "may better have been left unsaid". What the relevant parts of the record disclose with unmistakable clarity is that the Trial Assistant made a scrupulous, and successful, effort to avoid any inappropriate references to herself with regard to a relevant court episode with which she was inextricably connected, and that it was defense counsel who, in furtherance of his own appropriate trial purposes, undertook to make the District Attorney's role in the event the centerpiece of his own examinations. On the basis of a careful study of the entire record, it is my considered judgment that the Trial Assistant conducted herself throughout with a restraint, and with a moderation of language and manner, that is exceptional in trial records that I have read over the years, and with a sensitive and balanced

understanding of her ethical responsibilities that merits praise, not criticism.