OPINION OF THE COURT
Per Curiam.
Order entered on or about August 31, 2001 affirmed, with $10 costs.
The action, sounding in defamation, was tried over numerous court days spanning more than a month and culminated, after tumultuous deliberations, in a jury verdict largely favorable to defendants. In support of their CPLR 4404 motion to set aside the verdict, plaintiffs submitted affidavits by two jurors, Daniel and Garrison, the latter the jury foreperson, alleging, inter alia, that racial bias permeated the jury’s deliberations. The juror affidavits specifically alleged that Daniel, a black male, was “repeatedly attacked in racial overtones” and called an “Uncle Tom” by the remaining jurors, black and Hispanic females, and that Garrison, a white male, was “accused” by the remaining jurors of being a racist and of “colluding” with plaintiff’s counsel, also a white male, and, indeed, of having engaged in a “homosexual encounter” with plaintiff’s counsel in a courthouse bathroom. Both Daniel and Garrison indicated in their affidavits that the open racial hostilities between the jurors had a decided impact on the “compromise” verdict reached by the jury, and both juroraffiants expressed the view that the jury “failed to honor and exercise its sworn duty” in that it based its findings “on impermissible reasons and not on the evidence presented.”
The trial court “relucían [tly]” granted plaintiff’s motion to set aside the jury verdict based on juror misconduct. The court revealed — so far as appears for the first time on the record— that it had been made aware before rendition of the verdict of racial discord among the jurors. The court thus described the postverdict juror affidavits as being “entirely consistent with *540 facts repeatedly brought to the court’s attention before the verdict,” apparently referring to information gleaned from a series of private, unmemorialized interviews of Daniel and Garrison held by the court during deliberations.* In this connection, the court stated: “Twice during deliberations, Garrison and, the second time, Daniel as well expressed to the court grave concerns about the remaining jurors’ use of racial invectives toward Garrison, Daniel, and plaintiffs’ counsel. These invectives were more than vulgarities or personal animus; they were invoked with a purpose: to malign Garrison’s and Daniel’s view of the evidence and compel their conformity with a verdict intended to deny plaintiffs an award on account of their counsel’s race.” The court summed up its lengthy decision by stating: “[T]he indications all point in one direction: the jurors were motivated by illegal considerations, racial animus and pressure, to refuse to engage in deliberations with other jurors, look at the evidence, listen to and exchange views, and consult with one another impartially. Although four jurors may have intended to absolve defendants regardless of the evidence of their liability, there is a vast difference between a failure to be persuaded of defendants’ liability and the purposeful, racially motivated, disregard of both the evidence and the court’s instructions on the law.”
Although jurors ordinarily are not permitted to impeach their own verdict, an exception is made to the general rule when jurors are subject to an outside influence (see, Alford v Sventek, 53 NY2d 743 [1981]). “The scourge of racial prejudice, toward any group, which impugns a jury’s ability to impartially assess the evidence, constitutes a corrupt outside influence which cannot be sustained.” (People v Rukaj, 123 AD2d 277, 281 [1986].) Here, although the record sheds little light on the matter, the trial court in its written decision setting aside the jury verdict makes plain that the “grave concerns” voiced by two of the jurors over racial hostilities in the juror room were “repeatedly” brought to the court’s attention prior to verdict, a circumstance which distinguishes this case from those involving juror affidavits representing “mere afterthoughts or second guesses, raised post hoc by * * * disaffected juror[s].” (People v *541 Rukaj, supra, 123 AD2d at 280; see generally, Sharrow v Dick Corp., 86 NY2d 54, 60-61 [1995].) To be sure, meaningful appellate review of the trial court’s dispositive finding of juror misconduct is hindered by the absence below of an appropriate, preverdict investigation into the misconduct issue held on the record (see, Dudley v County of Saratoga, 145 AD2d 689, 691 [1988], lv denied 73 NY2d 710 [1989]; People v Rukaj, supra, 123 AD2d at 280; People v Lavender, 117 AD2d 253 [1986], appeal dismissed 68 NY2d 995 [1986]). It is also the case, however, that this same infirmity in the existing record precludes us from safely or fairly minimizing the role that invidious racial bias may well have played in the jury’s deliberative process. Given the lingering questions concerning the magnitude and effect of the jurors’ racial hostilities, and mindful that “[o]ur power to review the Trial [Judge’s] discretion must be exercised in the light of the fact that [she] was there and we were not” (Trapp v American Trading & Prod. Corp., 66 AD2d 515, 519 [1979]), we are constrained to agree that the interests of justice require that the matter be tried anew.
Nor is there record support for the dissenter’s conclusion that plaintiffs waived entitlement to raise the juror misconduct issue. As indicated, there is nothing in the record tending to indicate that the parties or their attorneys were made aware during deliberations of the jurors’ expressed concerns over race since, as the dissenting opinion itself puts it, none of the trial court’s “cautionary instructions to the jury * * * referred to race” and the “only [record] references to race are in the jurors’ [postverdict] affidavits” (dissenting op at 544, 546). In this posture, we are not prepared to say that plaintiffs knowingly relinquished the right to an impartial, untainted jury verdict by failing to request a mistrial or to seek other preverdict corrective action to address the then latent issue of juror racial animus, which, although apparently known all along to the trial court, was not disclosed on the record until the court’s written decision on plaintiff’s postverdict motion.
An independent basis for affirmance lies in the trial court’s express finding that the jury rendered an inconsistent, compromise verdict. As the trial court appropriately recognized, the verdict as against the corporate defendant was necessarily premised upon its vicarious liability for the defamatory conduct of the corporate officers named herein as individual defendants. After all, there was no reasonable view of the trial evidence to permit a finding that any other, unnamed corporate officer(s) *542 actively defamed plaintiffs or instigated any defamatory conduct, or that any of the (nonparty) corporate employees who defamed plaintiffs through picketing activity did so without the individual defendants’ imprimatur. In view of the “synchronized but irrational [jury] voting pattern” found by the trial court — by which the jury exonerated the individual defendants but found the corporate defendant liable — we find no cause to disturb the court’s determination that the jury verdict was irreconcilably inconsistent (see, Edin v Halff, 261 AD2d 569 [1999]; Perry v Costa, 97 AD2d 655 [1983], affd sub nom. Perry v Inter-County Sav. Bank, 62 NY2d 630 [1984]). Nor did the jury findings of no damages conclusively resolve the apparent inconsistencies in the jury’s special findings on the issue of vicarious liability, especially considering the trial court’s strongly stated concerns that the jurors compromised their views as a result of the racial hostilities discussed above. Finally, “[t]he disbanding of the jury without plaintiff[s’] noted objection here obliterated neither [their] right to seek a new trial nor the court’s capacity to grant it, where the interest of justice manifestly requires it.” (Vera v Bielomatik Corp., 199 AD2d 132, 134 [1993].)

 Although the record reflects that the parties and their counsel knew of the occurrence of the juror interviews, there is no indication in the record that the court timely notified the parties or counsel of the substance of the interviews, aside from a single, oblique reference by the court during colloquy that it had been informed that Garrison was accused of having had an “association” with plaintiffs’ counsel.