People v Wiggins (2024 NY Slip Op 01659)

People v Wiggins

2024 NY Slip Op 01659

Decided on March 22, 2024

Appellate Division, Fourth Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on March 22, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: WHALEN, P.J., CURRAN, BANNISTER, OGDEN, AND DELCONTE, JJ.

749 KA 22-00654

[*1]THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,
v
JAYLIN WIGGINS, DEFENDANT-APPELLANT. 

MICHAEL J. STACHOWSKI, P.C., BUFFALO (MICHAEL J. STACHOWSKI OF COUNSEL), FOR DEFENDANT-APPELLANT.
JOHN J. FLYNN, DISTRICT ATTORNEY, BUFFALO (HARMONY A. HEALY OF COUNSEL), FOR RESPONDENT. 

 Appeal from a judgment of the Erie County Court (Michael F. Pietruszka, J.), rendered September 10, 2018. The judgment convicted defendant upon a jury verdict of murder in the second degree, assault in the first degree and criminal possession of a weapon in the second degree. 
It is hereby ORDERED that the judgment so appealed from is affirmed.
Memorandum: Defendant appeals from a judgment convicting him upon a jury verdict of murder in the second degree (Penal Law § 125.25 [1]), assault in the first degree (§ 120.10 [1]), and criminal possession of a weapon in the second degree (§ 265.03 [3]). The conviction arises from two separate shootings, one in which a victim was fatally injured.
Initially, by failing to renew his motion for a trial order of dismissal after presenting evidence, defendant failed to preserve his challenge to the legal sufficiency of the evidence (see People v Hines, 97 NY2d 56, 61 [2001], rearg denied 97 NY2d 678 [2001]; People v Brooks, 139 AD3d 1391, 1392-1393 [4th Dept 2016], lv denied 28 NY3d 1026 [2016]). Nonetheless, " 'we necessarily review the evidence adduced as to each of the elements of the crimes in the context of our review of defendant's challenge regarding the weight of the evidence' " (People v Stepney, 93 AD3d 1297, 1298 [4th Dept 2012], lv denied 19 NY3d 968 [2012]; see People v Danielson, 9 NY3d 342, 349-350 [2007]).
Viewing the evidence in light of the elements of the crimes as charged to the jury (see Danielson, 9 NY3d at 349), we conclude that the verdict is not against the weight of the evidence (see generally People v Bleakley, 69 NY2d 490, 495 [1987]). A witness to the first shooting identified defendant as the shooter to a police detective just days after the incident. In addition, evidence at trial established that defendant matched the descriptions of the physical appearance of the shooter given by the witness and by the victim of the first shooting; that defendant was subsequently observed wearing an uncommon shirt which matched descriptions of the shooter's clothing given by the witness and the first victim, and was similar to the shirt the shooter was wearing during the second shooting, which occurred approximately one hour after the first shooting; and that ballistics evidence established that the same gun was used in both shootings. Even assuming, arguendo, that an acquittal would not have been unreasonable, we do not conclude that the jury "failed to give the evidence the weight it should be accorded" (id.). To the extent that there were "inconsistencies in [a witness'] testimony, [the inconsistencies] were properly considered by the jury[,] and there is no basis for disturbing its determinations" (People v Cirino, 203 AD3d 1661, 1663 [4th Dept 2022], lv denied 38 NY3d 1132 [2022] [internal quotation marks omitted]; see People v Jefferson, 26 AD3d 798, 798-799 [4th Dept 2006], lv denied 6 NY3d 895 [2006]).
Defendant contends that County Court erred in denying his request to discharge juror No. [*2]5 as "grossly unqualified" after she was observed allegedly sleeping during the court's jury charge (CPL 270.35 [1]; see People v Robinson, 121 AD3d 1179, 1180-1181 [3d Dept 2014]; see generally People v Wright, 16 AD3d 1113, 1113-1114 [4th Dept 2005], lv denied 4 NY3d 857 [2005]). The contention is not preserved for our review inasmuch as defendant failed to object to the court's inquiry of the juror and, additionally, failed to move to discharge that juror (see Wright, 16 AD3d at 1113). In any event, the court conducted an appropriate inquiry of the juror and accepted the assurances of the juror, after which defense counsel consented to the juror's continued service on the jury. Therefore, "defendant 'should not now be heard to complain' of the court's failure to discharge the juror" (People v Phillips, 34 AD3d 1231, 1231 [4th Dept 2006], lv denied 8 NY3d 848 [2007]).
Defendant further contends that the court abused its discretion in denying his motion for a mistrial on the ground that the jury was tainted by racial bias. The decision whether to grant or deny a motion for a mistrial is within the trial court's discretion (see People v DeJesus, 110 AD3d 1480, 1481-1482 [4th Dept 2013], lv denied 22 NY3d 1155 [2014]). We respectfully disagree with our dissenting colleagues that the court abused its discretion in denying defendant's motion, which was premised on concerns raised by juror No. 5 subsequent to the court's determination not to discharge her. Initially, this is not a case where a court failed to make an "appropriate inquiry into this most serious charge" (People v Rukaj, 123 AD2d 277, 279 [1st Dept 1986]). Instead, the court, after consultation with the parties, questioned juror No. 5 on allegations she raised with the court that she "was told on Friday [by another juror] that all black people look the same in the dark." The juror's concern was initially raised in a note, wherein she explained the comment was made during a discussion of whether to view the video evidence again or whether, as her fellow jurors asserted, the "video would not show anything better." The note explained that the comment was "insulting to [her]" and that she did "not want to be bullied into rushing [her] decision." Upon direct questioning, juror No. 5 identified juror No. 10 as the person who made the complained-of comment, but noted that "[w]e talked about it earlier," and moved on to raise a separate issue regarding the conduct of a man in the gallery during trial. She agreed that the concerns that she raised in the note, including the comment by juror No. 10, did not prevent her from continuing to be a fair and impartial juror.
Upon questioning by defense counsel, juror No. 5 agreed that there had been additional race-related comments in the jury room on Friday, but explained that she "confronted [her fellow jurors] today. We discussed it in deliberations." When asked by defense counsel how many jurors "expressed this type of bigotry," juror No. 5 answered, "approximately six," but when pressed to identify these additional jurors, she qualified her answer by explaining that "[t]hey changed their mind today. . . . [E]verybody went home and thought about the things they said and they brought it up" and "apologized for things that [were] said." Juror No. 5 asserted that this exchange led the jurors to take a second look at the evidence and also led to a similar frank discussion about age-related comments. As a result, although juror No. 5 could not "guarantee" that any racial animus had been extinguished, the juror expressed confidence that the jury was "aware of it, and are looking more deeper into the trial." The court nonetheless continued the inquiry by questioning juror No. 10, i.e., the juror identified as having made the complained-of comment, who agreed that she had made a statement on Friday to which juror No. 5 objected, but denied that it was phrased as reported. Juror No. 10 also confirmed juror No. 5's assertion that the initial deliberations on Friday, which had centered on the poor quality of the video evidence, had been rushed.
We conclude that, when considered in light of the full inquiry conducted by the court into the jury concerns, the record supports the conclusion that the procedure followed by the court appropriately ensured that "defendant's right to an impartial verdict [was] properly balanced with the jury's right to adjudicate 'free from outside interference' " (People v Kuzdzal, 31 NY3d 478, 486 [2018], quoting People v Rivera, 15 NY3d 207, 212 [2010]). Viewed as a whole, the record of the court's inquiry prior to denying defendant's motion does not evidence that juror No. 5's participation in deliberations was adversely affected or that she was even claiming as much (cf. Rukaj, 123 AD2d at 280-281). Moreover, on the broader issue of whether jury deliberations were tainted by racial bias, "[i]n a probing and tactful inquiry, the court [did] evaluate the nature of what [juror No. 5] ha[d] seen, heard, or ha[d] acquired knowledge of, and assess[ed] its importance and its bearing on the case" (People v Buford, 69 NY2d 290, 299 [1987]). Following that inquiry, the court was effectively tasked with determining whether the answers elicited provided evidence of racial bias potentially affecting jury deliberations or instead supported the [*3]conclusion that, following an initial rushed deliberation session, there was a frank discussion among the jurors about racial bias (and the appearance thereof) that prompted a closer look at the evidence. Juror No. 5's own expressed conclusion was the latter. Further, inasmuch as juror No. 5 declined to specifically identify any other juror as having made racially biased comments, any further investigation would have required an intrusive juror-by-juror inquiry, an approach that both parties agreed would be inappropriate. " '[W]hile a court looking into juror misconduct must investigate and, if necessary, correct a problem, it must also avoid tainting a jury unnecessarily. . . . In this endeavor, sometimes less is more' " (Kuzdzal, 31 NY3d at 486).
We further reject the contention of defendant that the court's handling of a jury note violated the requirements set forth in CPL 310.30 and People v O'Rama (78 NY2d 270 [1991]). The jury submitted a note saying that it had not been able to reach a unanimous verdict, and defendant contends that the court erred because it did not read aloud a portion of the note that provided vote numbers and thus denied defendant meaningful notice of the note. We note that, after advising the parties that the note contained numbers and declining to read the numbers aloud, the court offered to let defense counsel and the prosecutor read the note themselves. We conclude that defendant failed to preserve his contention for our review inasmuch as defense counsel was made aware that the note contained the vote and defense counsel failed to object to the court's failure to read it aloud (see People v Kalb, 91 AD3d 1359, 1369 [4th Dept 2012], lv denied 19 NY3d 963 [2012]; see generally People v Kadarko, 14 NY3d 426, 429 [2010]).
All concur except Ogden and DelConte, JJ., who dissent and vote to reverse in accordance with the following memorandum: We must respectfully dissent because we are unable to conclude on the record before us that the jury was not tainted by racial bias in their deliberations. "The scourge of racial prejudice, toward any group, which impugns a jury's ability to impartially assess the evidence, constitutes a corrupt outside influence which cannot be sustained" (People v Rukaj, 123 AD2d 277, 281 [1st Dept 1986]). It is fundamental that "[a]n accused is entitled to a fair trial" (People v Robinson, 273 NY 438, 444 [1937]). Although a trial judge is accorded significant latitude in making the findings necessary to determine whether a juror is grossly unqualified, we believe it was an abuse of discretion for County Court to deny defense counsel's motion for a mistrial under the circumstances (see People v Ortiz, 54 NY2d 288, 292 [1981]; see generally People v Thomas, 196 AD2d 462, 464 [1st Dept 1993], lv denied 82 NY2d 904 [1993]; People v Andrew, 156 AD2d 978, 979 [4th Dept 1989]).
After the commencement of deliberations, on a Monday, juror No. 5 told the court, in a note, that she had been "told on [that preceding] Friday that all black people look the same in the dark." Defendant is a Black man. Juror No. 5 identified juror No. 10 as the juror who made the statement. In the course of the discussions with the court and counsel, juror No. 5 indicated there were additional incidents of racial bias, including an allegedly racist joke, in the jury room and that she confronted the other jurors about them. She further indicated that she spoke to her fellow jurors about "the joke" and explained that "it wasn't a joke." Juror No. 5 continued, stating, "[s]o I don't know how far you want to go into an individual person because I don't know their names, but I let them know I didn't appreciate it, and I spoke on it." Juror No. 5 was asked how many jurors expressed bigotry, and she responded, "approximately six." She further explained that some of her fellow jurors made "statements as though blacks are different than — we live a whole different culture, whole different life, all of us, than white people . . . That's an insult to categorize everybody into this gang crime-related thing."
When juror No. 5 was again asked whether she could identify the approximately six jurors who she believed had expressed racial bigotry during deliberations, she responded that "[t]hey changed their mind today" and "[t]hey started apologizing for things that [were] said." When asked for assurances that the jury was free of racial animosity, juror No. 5 responded that she was unable to conclude that racial animus had been extinguished, and she stated, "I cannot guarantee it, but they're aware of it, and are looking more deeper into the trial than which they would have on Friday."
After that discussion, defense counsel moved for a mistrial. Defense counsel stated that a one-on-one voir dire of the entire jury was "impossible" but argued instead that sufficient evidence, including the allegations of racial bias by additional jurors, supported the motion for a mistrial without individual questioning of each juror. Defense counsel further argued that the reference to gang violence was "extremely troublesome" and also grounds for a mistrial.
The court opted to voir dire only juror No. 10 concerning juror No. 5's allegations. Juror No. 10 admitted that she made a statement and in response to the court's inquiry about her alleged assertion that all Black people look the same in the dark, invoked the fact that she has an Asian daughter. Despite juror No. 5's concerns of racial bias, juror No. 10 denied that other jurors had made similar statements and explained that "it was a . . . discussion on . . . clothing." When asked directly whether other jurors expressed similar statements, juror No. 10 was unable to give an unequivocal response and instead said, "I don't think. I think it was just a matter of where they were trying to — I feel that things were trying to be rushed on Friday, and think we should have taken more time." Upon further questioning whether "those sentiments" were expressed in the jury deliberations, juror No. 10 answered, "No. Not in that manner." Juror No. 10 returned to the jury room, and the court denied defendant's motion for a mistrial.
The question before us is whether the deliberations and jury verdict were influenced by prejudice or tainted by racial bias (see Rukaj, 123 AD2d at 281).
We recognize that "a trial court's investigation of juror misconduct or bias is a delicate and complex task" (People v Kuzdzal, 31 NY3d 478, 485 [2018] [internal quotation marks omitted]). On this record, however, the disclosure of alleged racial bias harbored by approximately half of the members of the jury warranted, at the very least, a question posed to each of the members of the panel of whether they could perform their duties as jurors without bias or prejudice. We also conclude that, in its voir dire of juror No. 10, the court did not explore whether juror No. 10 harbored any racial prejudice toward Black people, a prerequisite to determining whether she, in fact, could be unequivocally fair and impartial in deliberations. Under these circumstances, the court should also have determined on the record "whether the juror's statements created a substantial risk of prejudice to the rights of the defendant by coloring the views of the other jurors as well as her own" (People v Chodakowski, 200 AD3d 437, 437 [1st Dept 2021] [internal quotation marks omitted]). On this record, without that guarantee, we conclude that the court abused its discretion in denying defendant's motion for a mistrial. Therefore, we would reverse the judgment and grant a new trial on counts one, five and six of the indictment.
Entered: March 22, 2024
Ann Dillon Flynn
Clerk of the Court