Justice THOMAS, dissenting.
The Court today holds that the Sixth Amendment requires the States to provide a criminal defendant the opportunity to impeach a jury's guilty verdict with juror testimony about a juror's alleged racial bias, notwithstanding a state procedural rule forbidding such testimony. I agree with Justice ALITO that the Court's decision is incompatible with the text of the Amendment it purports to interpret and with our precedents. I write separately to explain that the Court's holding also cannot be squared with the original understanding of the Sixth or Fourteenth Amendments.
I
The Sixth Amendment's protection of the right, "[i]n all criminal prosecutions,"
*872 to a "trial, by an impartial jury," is limited to the protections that existed at common law when the Amendment was ratified. See, e.g., Apprendi v. New Jersey, 530 U.S. 466, 500, and n. 1, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (THOMAS, J., concurring); 3 J. Story, Commentaries on the Constitution of the United States § 1773, pp. 652-653 (1833) (Story) (explaining that "the trial by jury in criminal cases" protected by the Constitution is the same "great privilege" that was "a part of that admirable common law" of England); cf. 5 St. G. Tucker, Blackstone's Commentaries 349, n. 2 (1803). It is therefore "entirely proper to look to the common law" to ascertain whether the Sixth Amendment requires the result the Court today reaches. Apprendi, supra, at 500, n. 1, 120 S.Ct. 2348
The Sixth Amendment's specific guarantee of impartiality incorporates the common-law understanding of that term. See, e.g., 3 W. Blackstone, Commentaries on the Laws of England 365 (1769) (Blackstone) (describing English trials as "impartially just" because of their "caution against all partiality and bias" in the jury). The common law required a juror to have "freedome of mind" and to be "indifferent as hee stands unsworne." 1 E. Coke, First Part of the Institutes of the Laws of England § 234, p. 155a (16th ed. 1809); accord, 3 M. Bacon, A New Abridgment of the Law 258 (3d ed. 1768); cf. T. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 319 (1868) ("The jury must be indifferent between the prisoner and the commonwealth"). Impartial jurors could "have no interest of their own affected, and no personal bias, or pre-possession, in favor [of] or against either party." Pettis v. Warren, 1 Kirby 426, 427 (Conn.Super.1788).
II
The common-law right to a jury trial did not, however, guarantee a defendant the right to impeach a jury verdict with juror testimony about juror misconduct, including "a principal species of [juror] misbehaviour"-"notorious partiality." 3 Blackstone 388. Although partiality was a ground for setting aside a jury verdict, ibid., the English common-law rule at the time the Sixth Amendment was ratified did not allow jurors to supply evidence of that misconduct. In 1770, Lord Mansfield refused to receive a juror's affidavit to impeach a verdict, declaring that such an affidavit "can't be read." Rex v. Almon, 5 Burr. 2687, 98 Eng. Rep. 411 (K.B.). And in 1785, Lord Mansfield solidified the doctrine, holding that "[t]he Court [could not] receive such an affidavit from any of the jurymen" to prove that the jury had cast lots to reach a verdict. Vaise v. Delaval, 1 T.R. 11, 99 Eng. Rep. 944 (K.B.).[1]
At the time of the founding, the States took mixed approaches to this issue. See Cluggage v. Swan, 4 Binn. 150, 156 (Pa.1811) (opinion of Yeates, J.) ("The opinions of American judges ... have greatly differed on the point in question"); Bishop v. Georgia, 9 Ga. 121, 126 (1850) (describing the common law in 1776 on this question as "in a transition state"). Many States followed *873 Lord Mansfield's no-impeachment rule and refused to receive juror affidavits. See, e.g., Brewster v. Thompson, 1 N.J.L. 32 (1790) (per curiam ); Robbins v. Windover, 2 Tyl. 11, 14 (Vt.1802) ; Taylor v. Giger, 3 Ky. 586, 597-598 (1808) ; Price v. McIlvain, 2 Tread. 503, 504 (S.C. 1815) ; Tyler v. Stevens, 4 N.H. 116, 117 (1827) ; 1 Z. Swift, A Digest of the Laws of the State of Connecticut 775 (1822) ("In England, and in the courts of the United States, jurors are not permitted to be witnesses respecting the misconduct of the jury ... and this is, most unquestionably, the correct principle"). Some States, however, permitted juror affidavits about juror misconduct. See, e.g., Crawford v. State, 10 Tenn. 60, 68 (1821) ; Cochran v. Street, 1 Va. 79, 81 (1792). And others initially permitted such evidence but quickly reversed course. Compare, e.g., Smith v. Cheetham, 3 Cai. R. 57, 59-60 (N.Y.1805) (opinion of Livingston, J.) (permitting juror testimony), with Dana v. Tucker, 4 Johns. 487, 488-489 (N.Y.1809) (per curiam ) (overturning Cheetham ); compare also Bradley's Lessee v. Bradley, 4 Dall. 112, 1 L.Ed. 763 (1792) (permitting juror affidavits), with, e.g.,Cluggage, supra, at 156-158 (opinion of Yeates, J.) (explaining that Bradley was incorrectly reported and rejecting affidavits); compare also Talmadge v. Northrop, 1 Root 522 (Conn.1793) (admitting juror testimony), with State v. Freeman, 5 Conn. 348, 350-352 (1824) ("The opinion of almost the whole legal world is adverse to the reception of the testimony in question; and, in my opinion, on invincible foundations").
By the time the Fourteenth Amendment was ratified, Lord Mansfield's no-impeachment rule had become firmly entrenched in American law. See Lettow, New Trial for Verdict Against Law: Judge-Jury Relations in Early-Nineteenth Century America, 71 Notre Dame L. Rev. 505, 536 (1996) ("[O]pponents of juror affidavits had largely won out by the middle of the century"); 8 J. Wigmore, Evidence in Trials at Common Law § 2352, p. 697 (J. McNaughton rev. 1961) (Wigmore) (Lord Mansfield's rule "came to receive in the United States an adherence almost unquestioned"); J. Proffatt, A Treatise on Trial by Jury § 408, p. 467 (1877) ("It is a well established rule of law that no affidavit shall be received from a juror to impeach his verdict"). The vast majority of States adopted the no-impeachment rule as a matter of common law. See, e.g., Bull v. Commonwealth, 55 Va. 613, 627-628 (1857) ("[T]he practice appears to be now generally settled, to reject the testimony of jurors when offered to impeach their verdict. The cases on the subject are too numerous to be cited"); Tucker v. Town Council of South Kingstown, 5 R.I. 558, 560 (1859) (collecting cases); State v. Coupenhaver, 39 Mo. 430 (1867) ("The law is well settled that a traverse juror cannot be a witness to prove misbehavior in the jury in regard to their verdict"); Peck v. Brewer, 48 Ill. 54, 63 (1868) ("So far back as ... 1823, the doctrine was held that the affidavits of jurors cannot be heard to impeach their verdict"); Heffron v. Gallupe, 55 Me. 563, 566 (1868) (ruling inadmissible "depositions of ... jurors as to what transpired in the jury room"); Withers v. Fiscus, 40 Ind. 131, 131-132 (1872) ("In the United States it seems to be settled, notwithstanding a few adjudications to the contrary ..., that such affidavits cannot be received").[2]
*874 The Court today acknowledges that the States "adopted the Mansfield rule as a matter of common law," ante, at 863, but ascribes no significance to that fact. I would hold that it is dispositive. Our common-law history does not establish that-in either 1791 (when the Sixth Amendment was ratified) or 1868 (when the Fourteenth Amendment was ratified)-a defendant had the right to impeach a verdict with juror testimony of juror misconduct. In fact, it strongly suggests that such evidence was prohibited. In the absence of a definitive common-law tradition permitting impeachment by juror testimony, we have no basis to invoke a constitutional provision that merely "follow[s] out the established course of the common law in all trials for crimes," 3 Story § 1785, at 662, to overturn Colorado's decision to preserve the no-impeachment rule, cf. Boumediene v. Bush, 553 U.S. 723, 832-833, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (Scalia, J., dissenting).
* * *
Perhaps good reasons exist to curtail or abandon the no-impeachment rule. Some States have done so, see Appendix to majority opinion, ante, and others have not. Ultimately, that question is not for us to decide. It should be left to the political process described by Justice ALITO. See post, at 876 - 878 (dissenting opinion). In its attempt to stimulate a "thoughtful, rational dialogue" on race relations, ante, at 871, the Court today ends the political process and imposes a uniform, national rule. The Constitution does not require such a rule. Neither should we.
I respectfully dissent.
Justice ALITO, with whom THE CHIEF JUSTICE and Justice THOMAS join, dissenting.
Our legal system has many rules that restrict the admission of evidence of statements made under circumstances in which confidentiality is thought to be essential. Statements made to an attorney in obtaining legal advice, statements to a treating physician, and statements made to a spouse or member of the clergy are familiar examples. See Trammel v . United States, 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). Even if a criminal defendant whose constitutional rights are at stake has a critical need to obtain and introduce evidence of such statements, long-established rules stand in the way. The goal of avoiding interference with confidential communications of great value has long been thought to justify the loss of important evidence and the effect on our justice system that this loss entails.
The present case concerns a rule like those just mentioned, namely, the age-old rule against attempting to overturn or "impeach" a jury's verdict by offering statements made by jurors during the course of deliberations. For centuries, it has been the judgment of experienced judges, trial attorneys, scholars, and lawmakers that allowing jurors to testify after a trial about what took place in the jury room would undermine the system of trial by jury that is integral to our legal system.
Juries occupy a unique place in our justice system. The other participants in a trial-the presiding judge, the attorneys, the witnesses-function in an arena governed by strict rules of law. Their every word is recorded and may be closely scrutinized for missteps.
When jurors retire to deliberate, however, they enter a space that is not regulated in the same way. Jurors are ordinary people. They are expected to speak, debate, argue, and make decisions the way ordinary people do in their daily lives. Our Constitution places great value on this way of thinking, speaking, and deciding. The jury trial right protects parties in *875 court cases from being judged by a special class of trained professionals who do not speak the language of ordinary people and may not understand or appreciate the way ordinary people live their lives. To protect that right, the door to the jury room has been locked, and the confidentiality of jury deliberations has been closely guarded.
Today, with the admirable intention of providing justice for one criminal defendant, the Court not only pries open the door; it rules that respecting the privacy of the jury room, as our legal system has done for centuries, violates the Constitution. This is a startling development, and although the Court tries to limit the degree of intrusion, it is doubtful that there are principled grounds for preventing the expansion of today's holding.
The Court justifies its decision on the ground that the nature of the confidential communication at issue in this particular case-a clear expression of what the Court terms racial bias[1] -is uniquely harmful to our criminal justice system. And the Court is surely correct that even a tincture of racial bias can inflict great damage on that system, which is dependent on the public's trust. But until today, the argument that the Court now finds convincing has not been thought to be sufficient to overcome confidentiality rules like the one at issue here.
Suppose that a prosecution witness gives devastating but false testimony against a defendant, and suppose that the witness's motivation is racial bias. Suppose that the witness admits this to his attorney, his spouse, and a member of the clergy. Suppose that the defendant, threatened with conviction for a serious crime and a lengthy term of imprisonment, seeks to compel the attorney, the spouse, or the member of the clergy to testify about the witness's admissions. Even though the constitutional rights of the defendant hang in the balance, the defendant's efforts to obtain the testimony would fail. The Court provides no good reason why the result in this case should not be the same.
I
Rules barring the admission of juror testimony to impeach a verdict (so-called "no-impeachment rules") have a long history. Indeed, they pre-date the ratification of the Constitution. They are typically traced back to Vaise v. Delaval, 1 T.R. 11, 99 Eng. Rep. 944 (K.B. 1785), in which Lord Mansfield declined to consider an affidavit from two jurors who claimed that the jury had reached its verdict by lot. See Warger v. Shauers, 574 U.S. ----, ----, 135 S.Ct. 521, 525-526, 190 L.Ed.2d 422 (2014). Lord Mansfield's approach "soon took root in the United States," ibid. , and "[b]y the beginning of [the 20th] century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict," Tanner v. United States, 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) ; see 27 C. Wright & V. Gold, Federal Practice and Procedure: Evidence § 6071, p. 431 (2d ed. 2007) (Wright & Gold) (noting that the Mansfield approach "came to be accepted in almost all states").
In McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915), this Court adopted a strict no-impeachment rule for *876 cases in federal court. McDonald involved allegations that the jury had entered a quotient verdict-that is, that it had calculated a damages award by taking the average of the jurors' suggestions. Id., at 265-266, 35 S.Ct. 783. The Court held that evidence of this misconduct could not be used. Id., at 269, 35 S.Ct. 783. It applied what it said was "unquestionably the general rule, that the losing party cannot, in order to secure a new trial, use the testimony of jurors to impeach their verdict." Ibid . The Court recognized that the defendant had a powerful interest in demonstrating that the jury had "adopted an arbitrary and unjust method in arriving at their verdict." Id ., at 267, 35 S.Ct. 783. "But," the Court warned, "let it once be established that verdicts ... can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding." Ibid . This would lead to "harass[ment]" of jurors and "the destruction of all frankness and freedom of discussion and conference." Id ., at 267-268, 35 S.Ct. 783. Ultimately, even though the no-impeachment rule "may often exclude the only possible evidence of misconduct," relaxing the rule "would open the door to the most pernicious arts and tampering with jurors." Id ., at 268, 35 S.Ct. 783 (internal quotation marks omitted).
The firm no-impeachment approach taken in McDonald came to be known as "the federal rule." This approach categorically bars testimony about jury deliberations, except where it is offered to demonstrate that the jury was subjected to an extraneous influence (for example, an attempt to bribe a juror). Warger, supra, at 876, 135 S.Ct., at 526 ; Tanner, supra, at 117, 107 S.Ct. 2739 ;[2] see 27 Wright & Gold § 6071, at 432-433.
Some jurisdictions, notably Iowa, adopted a more permissive rule. Under the Iowa rule, jurors were generally permitted to testify about any subject except their "subjective intentions and thought processes in reaching a verdict." Warger, supra, at 864, 135 S.Ct., at 526. Accordingly, the Iowa rule allowed jurors to "testify as to events or conditions which might have improperly influenced the verdict, even if these took place during deliberations within the jury room." 27 Wright & Gold § 6071, at 432.
Debate between proponents of the federal rule and the Iowa rule emerged during the framing and adoption of Federal Rule of Evidence 606(b). Both sides had their supporters. The contending arguments were heard and considered, and in the end the strict federal approach was retained.
An early draft of the Advisory Committee on the Federal Rules of Evidence included a version of the Iowa rule, 51 F.R.D. 315, 387-388 (1971). That draft was forcefully criticized, however,[3] and the *877 Committee ultimately produced a revised draft that retained the well-established federal approach. Tanner, supra, at 122, 107 S.Ct. 2739 ; see Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, Revised Draft of Proposed Rules of Evidence for the United States Courts and Magistrates 73 (Oct. 1971). Expressly repudiating the Iowa rule, the new draft provided that jurors generally could not testify "as to any matter or statement occurring during the course of the jury's deliberations." Ibid. This new version was approved by the Judicial Conference and sent to this Court, which adopted the rule and referred it to Congress. 56 F.R.D. 183, 265-266 (1972).
Initially, the House rejected this Court's version of Rule 606(b) and instead reverted to the earlier (and narrower) Advisory Committee draft. Tanner, supra, at 123, 107 S.Ct. 2739 ; see H.R.Rep. No. 93-650, pp. 9-10 (1973) (criticizing the Supreme Court draft for preventing jurors from testifying about "quotient verdict[s]" and other "irregularities which occurred in the jury room"). In the Senate, however, the Judiciary Committee favored this Court's rule. The Committee Report observed that the House draft broke with "long-accepted Federal law" by allowing verdicts to be "challenge[d] on the basis of what happened during the jury's internal deliberations." S.Rep. No. 93-1277, p. 13 (1974) (S. Rep.). In the view of the Senate Committee, the House rule would have "permit[ted] the harassment of former jurors" as well as "the possible exploitation of disgruntled or otherwise badly-motivated ex-jurors." Id., at 14. This result would have undermined the finality of verdicts, violated "common fairness," and prevented jurors from "function[ing] effectively." Ibid. The Senate rejected the House version of the rule and returned to the Court's rule. A Conference Committee adopted the Senate version, see H.R. Conf. Rep. No. 93-1597, p. 8 (1974), and this version was passed by both Houses and was signed into law by the President.
As this summary shows, the process that culminated in the adoption of Federal Rule of Evidence 606(b) was the epitome of reasoned democratic rulemaking. The "distinguished, Supreme Court-appointed" members of the Advisory Committee went through a 7-year drafting process, "produced two well-circulated drafts," and "considered numerous comments from persons involved in nearly every area of court-related law." Rothstein, The Proposed Amendments to the Federal Rules of Evidence, 62 Geo. L.J. 125 (1973). The work of the Committee was considered and approved by the experienced appellate and trial judges serving on the Judicial Conference and by our predecessors on this Court. After that, the matter went to Congress, which "specifically understood, considered, and rejected a version of [the rule] that would have allowed jurors to testify on juror conduct during deliberations." Tanner, 483 U.S., at 125, 107 S.Ct. 2739. The judgment of all these participants in the process, which was informed by their assessment of an empirical issue, i.e., the effect that the competing Iowa rule would have had on the jury system, is entitled to great respect.
Colorado considered this same question, made the same judgment as the participants in the federal process, and adopted a very similar rule. In doing so, it joined *878 the overwhelming majority of States. Ante, at 864 - 865. In the great majority of jurisdictions, strong no-impeachment rules continue to be "viewed as both promoting the finality of verdicts and insulating the jury from outside influences." Warger, 574 U.S., at ----, 135 S.Ct., at 526.
II
A
Recognizing the importance of Rule 606(b), this Court has twice rebuffed efforts to create a Sixth Amendment exception-first in Tanner and then, just two Terms ago, in Warger .
The Tanner petitioners were convicted of committing mail fraud and conspiring to defraud the United States. 483 U.S., at 109-110, 112-113, 107 S.Ct. 2739. After the trial, two jurors came forward with disturbing stories of juror misconduct. One claimed that several jurors "consumed alcohol during lunch breaks ... causing them to sleep through the afternoons." Id., at 113, 107 S.Ct. 2739. The second added that jurors also smoked marijuana and ingested cocaine during the trial. Id., at 115-116, 107 S.Ct. 2739. This Court held that evidence of this bacchanalia could properly be excluded under Rule 606(b). Id., at 127, 107 S.Ct. 2739.
The Court noted that "[s]ubstantial policy considerations support the common-law rule against the admission of jury testimony to impeach a verdict." Id., at 119, 107 S.Ct. 2739. While there is "little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior," the Court observed, it is "not at all clear ... that the jury system could survive such efforts to perfect it." Id ., at 120, 107 S.Ct. 2739. Allowing such post-verdict inquiries would "seriously disrupt the finality of the process." Ibid . It would also undermine "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople." Id ., at 120-121, 107 S.Ct. 2739.
The Tanner petitioners, of course, had a Sixth Amendment right "to 'a tribunal both impartial and mentally competent to afford a hearing.' " Id ., at 126, 107 S.Ct. 2739 (quoting Jordan v. Massachusetts, 225 U.S. 167, 176, 32 S.Ct. 651, 56 L.Ed. 1038 (1912) ). The question, however, was whether they also had a right to an evidentiary hearing featuring "one particular kind of evidence inadmissible under the Federal Rules." 483 U.S., at 126-127, 107 S.Ct. 2739. Turning to that question, the Court noted again that "long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry." Id ., at 127, 107 S.Ct. 2739. By contrast, "[p]etitioners' Sixth Amendment interests in an unimpaired jury ... [were] protected by several aspects of the trial process." Ibid.
The Court identified four mechanisms that protect defendants' Sixth Amendment rights. First, jurors can be "examined during voir dire ." Ibid. Second, "during the trial the jury is observable by the court, by counsel, and by court personnel." Ibid. Third, "jurors are observable by each other, and may report inappropriate juror behavior to the court before they render a verdict." Ibid. And fourth, "after the trial a party may seek to impeach the verdict by nonjuror evidence of misconduct." Ibid. These "other sources of protection of petitioners' right to a competent jury" convinced the Court that the juror testimony was properly excluded. Ibid .
Warger involved a negligence suit arising from a motorcycle crash. 574 U.S., at ----, 135 S.Ct., at 524. During voir dire, *879 the individual who eventually became the jury's foreperson said that she could decide the case fairly and impartially. Id., at ----, 135 S.Ct., at 524-525. After the jury returned a verdict in favor of the defendant, one of the jurors came forward with evidence that called into question the truthfulness of the foreperson's responses during voir dire . According to this juror, the foreperson revealed during the deliberations that her daughter had once caused a deadly car crash, and the foreperson expressed the belief that a lawsuit would have ruined her daughter's life. Ibid.
In seeking to use this testimony to overturn the jury's verdict, the plaintiff's primary contention was that Rule 606(b) does not apply to evidence concerning a juror's alleged misrepresentations during voir dire . If otherwise interpreted, the plaintiff maintained, the rule would threaten his right to trial by an impartial jury.[4] The Court disagreed, in part because "any claim that Rule 606(b) is unconstitutional in circumstances such as these is foreclosed by our decision in Tanner ." Id., at ----, 135 S.Ct., at 529. The Court explained that "[e]ven if jurors lie in voir dire in a way that conceals bias, juror impartiality is adequately assured by" two of the other Tanner safeguards: pre-verdict reports by the jurors and non-juror evidence. 574 U.S., at ----, 135 S.Ct., at 529.
Tanner and Warger fit neatly into this Court's broader jurisprudence concerning the constitutionality of evidence rules. As the Court has explained, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Holmes v. South Carolina, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (internal quotation marks and alteration omitted). Thus, evidence rules of this sort have been invalidated only if they "serve no legitimate purpose or ... are disproportionate to the ends that they are asserted to promote." Id., at 326, 126 S.Ct. 1727. Tanner and Warger recognized that Rule 606(b) serves vital purposes and does not impose a disproportionate burden on the jury trial right.
Today, for the first time, the Court creates a constitutional exception to no-impeachment rules. Specifically, the Court holds that no-impeachment rules violate the Sixth Amendment to the extent that they preclude courts from considering evidence of a juror's racially biased comments. Ante, at 869. The Court attempts to distinguish Tanner and Warger , but its efforts fail.
Tanner and Warger rested on two basic propositions. First, no-impeachment rules advance crucial interests. Second, the right to trial by an impartial jury is adequately protected by mechanisms other than the use of juror testimony regarding jury deliberations. The first of these propositions applies regardless of the nature of the juror misconduct, and the Court does not argue otherwise. Instead, it contends that, in cases involving racially biased jurors, the Tanner safeguards are less effective and the defendant's Sixth Amendment interests are more profound. Neither argument is persuasive.
B
As noted above, Tanner identified four "aspects of the trial process" that protect a defendant's Sixth Amendment rights: (1) voir dire ; (2) observation by the court, counsel, and court personnel; (3) pre-verdict reports by the jurors; and (4) non-juror evidence.
*880 483 U.S., at 127, 107 S.Ct. 2739.[5] Although the Court insists that that these mechanisms "may be compromised" in cases involving allegations of racial bias, it addresses only two of them and fails to make a sustained argument about either. Ante, at 868 - 869.
1
First, the Court contends that the effectiveness of voir dire is questionable in cases involving racial bias because pointed questioning about racial attitudes may highlight racial issues and thereby exacerbate prejudice. Ibid. It is far from clear, however, that careful voir dire cannot surmount this problem. Lawyers may use questionnaires or individual questioning of prospective jurors[6] in order to elicit frank answers that a juror might be reluctant to voice in the presence of other prospective jurors.[7] Moreover, practice guides are replete with advice on conducting effective voir dire on the subject of race. They outline a variety of subtle and nuanced approaches that avoid pointed questions.[8] And of course, if an attorney is concerned that a juror is concealing bias, a peremptory strike may be used.[9]
*881 The suggestion that voir dire is ineffective in unearthing bias runs counter to decisions of this Court holding that voir dire on the subject of race is constitutionally required in some cases, mandated as a matter of federal supervisory authority in others, and typically advisable in any case if a defendant requests it. See Turner v. Murray, 476 U.S. 28, 36-37, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986) ; Rosales-Lopez v. United States, 451 U.S. 182, 192, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (plurality opinion); Ristaino v. Ross, 424 U.S. 589, 597, n. 9, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976). If voir dire were not useful in identifying racial prejudice, those decisions would be pointless. Cf. Turner, supra, at 36, 106 S.Ct. 1683 (plurality opinion) (noting "the ease with which [the] risk [of racial bias] could have been minimized" through voir dire ). Even the majority recognizes the "advantages of careful voir dire " as a "proces[s] designed to prevent racial bias in jury deliberations." Ante, at 871. And reported decisions substantiate that voir dire can be effective in this regard. E.g., Brewer v. Marshall, 119 F.3d 993, 995-996 (C.A.1 1997) ; United States v. Hasting, 739 F.2d 1269, 1271 (C.A.7 1984) ; People v. Harlan, 8 P.3d 448, 500 (Colo.2000) ; see Brief for Respondent 23-24, n. 7 (listing additional cases). Thus, while voir dire is not a magic cure, there are good reasons to think that it is a valuable tool.
In any event, the critical point for present purposes is that the effectiveness of voir dire is a debatable empirical proposition. Its assessment should be addressed in the process of developing federal and state evidence rules. Federal and state rulemakers can try a variety of approaches, and they can make changes in response to the insights provided by experience and research. The approach taken by today's majority-imposing a federal constitutional rule on the entire country-prevents experimentation and makes change exceedingly hard.[10]
2
The majority also argues-even more cursorily-that "racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations."
*882 Ante, at 869. This is so, we are told, because it is difficult to "call [another juror] a bigot." Ibid.
Since the Court's decision mandates the admission of the testimony of one juror about a statement made by another juror during deliberations, what the Court must mean in making this argument is that jurors are less willing to report biased comments by fellow jurors prior to the beginning of deliberations (while they are still sitting with the biased juror) than they are after the verdict is announced and the jurors have gone home. But this is also a questionable empirical assessment, and the Court's seat-of-the-pants judgment is no better than that of those with the responsibility of drafting and adopting federal and state evidence rules. There is no question that jurors do report biased comments made by fellow jurors prior to the beginning of deliberations. See, e.g., United States v. McClinton, 135 F.3d 1178, 1184-1185 (C.A.7 1998) ; United States v. Heller, 785 F.2d 1524, 1525-1529 (C.A.11 1986) ; Tavares v. Holbrook, 779 F.2d 1, 1-3 (C.A.1 1985) (Breyer, J.); see Brief for Respondent 31-32, n. 10; Brief for United States as Amicus Curiae 31. And the Court marshals no evidence that such pre-deliberation reporting is rarer than the post-verdict variety.
Even if there is something to the distinction that the Court makes between pre- and post-verdict reporting, it is debatable whether the difference is significant enough to merit different treatment. This is especially so because post-verdict reporting is both more disruptive and may be the result of extraneous influences. A juror who is initially in the minority but is ultimately persuaded by other jurors may have second thoughts after the verdict is announced and may be angry with others on the panel who pressed for unanimity. In addition, if a verdict is unpopular with a particular juror's family, friends, employer, co-workers, or neighbors, the juror may regret his or her vote and may feel pressured to rectify what the jury has done.
In short, the Court provides no good reason to depart from the calculus made in Tanner and Warger . Indeed, the majority itself uses hedged language and appears to recognize that this "pragmatic" argument is something of a makeweight. Ante, at 868 - 869 (noting that the argument is "not dispositive"); ante, at 869 (stating that the operation of the safeguards "may be compromised, or they may prove insufficient").
III
A
The real thrust of the majority opinion is that the Constitution is less tolerant of racial bias than other forms of juror misconduct, but it is hard to square this argument with the nature of the Sixth Amendment right on which petitioner's argument and the Court's holding are based. What the Sixth Amendment protects is the right to an "impartial jury." Nothing in the text or history of the Amendment or in the inherent nature of the jury trial right suggests that the extent of the protection provided by the Amendment depends on the nature of a jury's partiality or bias. As the Colorado Supreme Court aptly put it, it is hard to "discern a dividing line between different types of juror bias or misconduct, whereby one form of partiality would implicate a party's Sixth Amendment right while another would not." 350 P.3d 287, 293 (2015).[11]
*883 Nor has the Court found any decision of this Court suggesting that the Sixth Amendment recognizes some sort of hierarchy of partiality or bias. The Court points to a line of cases holding that, in some narrow circumstances, the Constitution requires trial courts to conduct voir dire on the subject of race. Those decisions, however, were not based on a ranking of types of partiality but on the Court's conclusion that in certain cases racial bias was especially likely. See Turner, 476 U.S., at 38, n. 12, 106 S.Ct. 1683 (plurality opinion) (requiring voir dire on the subject of race where there is "a particularly compelling need to inquire into racial prejudice" because of a qualitatively higher "risk of racial bias"); Ristaino, 424 U.S., at 596, 96 S.Ct. 1017 (explaining that the requirement applies only if there is a "constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be [impartial]").[12] Thus, this line of cases does not advance the majority's argument.
It is undoubtedly true that "racial bias implicates unique historical, constitutional, and institutional concerns." Ante, at 868. But it is hard to see what that has to do with the scope of an individual criminal defendant's Sixth Amendment right to be judged impartially. The Court's efforts to reconcile its decision with McDonald,Tanner, and Warger illustrate the problem. The Court writes that the misconduct in those cases, while "troubling and unacceptable," was "anomalous." Ante, at 868. By contrast, racial bias, the Court says, is a "familiar and recurring evil" that causes "systemic injury to the administration of justice." Ante, at 868.
Imagine two cellmates serving lengthy prison terms. Both were convicted for homicides committed in unrelated barroom fights. At the trial of the first prisoner, a juror, during deliberations, expressed animosity toward the defendant because of his race. At the trial of the second prisoner, a juror, during deliberations, expressed animosity toward the defendant because he was wearing the jersey of a hated football team. In both cases, jurors come forward after the trial and reveal what the biased juror said in the jury room. The Court would say to the first prisoner: "You are entitled to introduce the jurors' testimony, because racial bias is damaging to our society." To the second, the Court would say: "Even if you did not have an impartial jury, you must stay in prison because sports rivalries are not a major societal issue."
This disparate treatment is unsupportable under the Sixth Amendment. If the Sixth Amendment requires the admission of juror testimony about statements or conduct during deliberations that show one type of juror partiality, then statements or conduct showing any type of partiality should be treated the same way.
B
Recasting this as an equal protection case would not provide a ground for limiting the holding to cases involving racial bias. At a minimum, cases involving bias based on any suspect classification-such as national origin[13] or religion[14] -would merit equal treatment. So, I think, would *884 bias based on sex, United States v . Virginia, 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), or the exercise of the First Amendment right to freedom of expression or association. See Regan v. Taxation With Representation of Washington, 461 U.S. 540, 545, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). Indeed, convicting a defendant on the basis of any irrational classification would violate the Equal Protection Clause.
Attempting to limit the damage worked by its decision, the Court says that only "clear" expressions of bias must be admitted, ante, at 883, but judging whether a statement is sufficiently "clear" will often not be easy. Suppose that the allegedly biased juror in this case never made reference to Peña-Rodriguez's race or national origin but said that he had a lot of experience with "this macho type" and knew that men of this kind felt that they could get their way with women. Suppose that other jurors testified that they were certain that "this macho type" was meant to refer to Mexican or Hispanic men. Many other similarly suggestive statements can easily be imagined, and under today's decision it will be difficult for judges to discern the dividing line between those that are "clear[ly]" based on racial or ethnic bias and those that are at least somewhat ambiguous.
IV
Today's decision-especially if it is expanded in the ways that seem likely-will invite the harms that no-impeachment rules were designed to prevent.
First, as the Court explained in Tanner, "postverdict scrutiny of juror conduct" will inhibit "full and frank discussion in the jury room." 483 U.S., at 120-121, 107 S.Ct. 2739 ; see also McDonald, 238 U.S., at 267-268, 35 S.Ct. 783 (warning that the use of juror testimony about misconduct during deliberations would "make what was intended to be a private deliberation, the constant subject of public investigation-to the destruction of all frankness and freedom of discussion and conference"). Or, as the Senate Report put it: "[C]ommon fairness requires that absolute privacy be preserved for jurors to engage in the full and free debate necessary to the attainment of just verdicts. Jurors will not be able to function effectively if their deliberations are to be scrutinized in post-trial litigation." S. Rep., at 14.
Today's ruling will also prompt losing parties and their friends, supporters, and attorneys to contact and seek to question jurors, and this pestering may erode citizens' willingness to serve on juries. Many jurisdictions now have rules that prohibit or restrict post-verdict contact with jurors, but whether those rules will survive today's decision is an open question-as is the effect of this decision on privilege rules such as those noted at the outset of this opinion.[15]
*885 Where post-verdict approaches are permitted or occur, there is almost certain to be an increase in harassment, arm-twisting, and outright coercion. See McDonald, supra, at 267, 35 S.Ct. 783 ; S. Rep., at 14 (explaining that a laxer rule "would permit the harassment of former jurors by losing parties as well as the possible exploitation of disgruntled or otherwise badly-motivated ex-jurors"); 350 P.3d, at 293. As one treatise explains, "[a] juror who reluctantly joined a verdict is likely to be sympathetic to overtures by the loser, and persuadable to the view that his own consent rested on false or impermissible considerations, and the truth will be hard to know." 3 C. Mueller & L. Kirkpatrick, Federal Evidence § 6:16, p. 75 (4th ed. 2013).
The majority's approach will also undermine the finality of verdicts. "Public policy requires a finality to litigation." S. Rep., at 14. And accusations of juror bias-which may be "raised for the first time days, weeks, or months after the verdict"-can "seriously disrupt the finality of the process." Tanner, supra, at 120, 107 S.Ct. 2739. This threatens to "degrad[e] the prominence of the trial itself" and to send the message that juror misconduct need not be dealt with promptly. Engle v. Isaac, 456 U.S. 107, 127, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). See H.R. Conf. Rep. No. 93-1597, at 8 ("The Conferees believe that jurors should be encouraged to be conscientious in promptly reporting to the court misconduct that occurs during jury deliberations").
The Court itself acknowledges that strict no-impeachment rules "promot[e] full and vigorous discussion," protect jurors from "be[ing] harassed or annoyed by litigants seeking to challenge the verdict," and "giv[e] stability and finality to verdicts." Ante, at 865. By the majority's own logic, then, imposing exceptions on no-impeachment rules will tend to defeat full and vigorous discussion, expose jurors to harassment, and deprive verdicts of stability.
The Court's only response is that some jurisdictions already make an exception for racial bias, and the Court detects no signs of "a loss of juror willingness to engage in searching and candid deliberations." Ante, at 870. One wonders what sort of outward signs the Court would expect to see if jurors in these jurisdictions do not speak as freely in the jury room as their counterparts in jurisdictions with strict no-impeachment rules. Gathering and assessing evidence regarding the quality of jury deliberations in different jurisdictions would be a daunting enterprise, and the Court offers no indication that anybody has undertaken that task.
In short, the majority barely bothers to engage with the policy issues implicated by no-impeachment rules. But even if it had carefully grappled with those issues, it still would have no basis for exalting its own judgment over that of the many expert policymakers who have endorsed broad no-impeachment rules.
V
The Court's decision is well-intentioned. It seeks to remedy a flaw in the jury trial system, but as this Court said some years ago, it is questionable whether our system of trial by jury can endure this attempt to perfect it. Tanner, 483 U.S., at 120, 107 S.Ct. 2739.
I respectfully dissent.
*886 APPENDIX
Codified Exceptions in Addition to Those Enumerated in Fed. Rule Evid. 606(b)
See Ariz. Rules Crim. Proc. 24.1(c)(3), (d) (2011) (exception for evidence of misconduct, including verdict by game of chance or intoxication); Idaho Rule Evid. 606(b) (2016) (game of chance); Ind. Rule Evid. 606(b)(2)(A) (Burns 2014) (drug or alcohol use); Minn. Rule Evid. 606(b) (2014) (threats of violence or violent acts); Mont. Rule Evid. 606(b) (2015) (game of chance); N.D. Rule Evid. 606(b)(2)(C) (2016-2017) (same); Tenn. Rule Evid. 606(b) (2016) (quotient verdict or game of chance); Tex. Rule Evid. 606(b)(2)(B) (West 2016) (rebutting claim juror was unqualified); Vt. Rule Evid. 606(b) (Cum. Supp. 2016) (juror communication with nonjuror); see also 27 C. Wright & V. Gold, Federal Practice and Procedure: Evidence § 6071, p. 447, and n. 66 (2d ed. 2007); id., at 451, and n. 70; id., at 452, and n. 72.
Judicially Recognized Exceptions for Evidence of Racial Bias
See State v. Santiago, 245 Conn. 301, 323-340, 715 A.2d 1, 14-22 (1998) ; Kittle v. United States, 65 A.3d 1144, 1154-1156 (D.C.2013) ; Fisher v. State, 690 A.2d 917, 919-921, and n. 4 (Del.1996) (Appendix to opinion), Powell v. Allstate Ins. Co., 652 So.2d 354, 357-358 (Fla.1995) ; Spencer v. State, 260 Ga. 640, 643-644, 398 S.E.2d 179, 184-185 (1990) ; State v. Jackson, 81 Hawai'i 39, 48-49, 912 P.2d 71, 80-81 (1996) ; Commonwealth v. Laguer, 410 Mass. 89, 97-98, 571 N.E.2d 371, 376 (1991) ; State v. Callender, 297 N.W.2d 744, 746 (Minn.1980) ; Fleshner v. Pepose Vision Inst., P.C., 304 S.W.3d 81, 87-90 (Mo.2010) ; State v. Levitt, 36 N.J. 266, 271-273, 176 A.2d 465, 467-468 (1961) ; People v. Rukaj, 123 App.Div.2d 277, 280-281, 506 N.Y.S.2d 677, 679-680 (1986) ; State v. Hidanovic, 2008 ND 66, ¶¶ 21-26, 747 N.W.2d 463, 472-474 ; State v. Brown, 62 A.3d 1099, 1110 (R.I.2013) ; State v. Hunter, 320 S.C. 85, 88, 463 S.E.2d 314, 316 (1995) ; Seattle v. Jackson, 70 Wash.2d 733, 738, 425 P.2d 385, 389 (1967) ; After Hour Welding, Inc. v. Laneil Management Co., 108 Wis.2d 734, 739-740, 324 N.W.2d 686, 690 (1982).

Prior to 1770, it appears that juror affidavits were sometimes received to impeach a verdict on the ground of juror misbehavior, although only "with great caution." McDonald v. Pless, 238 U.S. 264, 268, 35 S.Ct. 783, 59 L.Ed. 1300 (1915) ; see, e.g., Dent v. The Hundred of Hertford, 2 Salk. 645, 91 Eng. Rep. 546 (K.B. 1696); Philips v. Fowler, Barnes. 441, 94 Eng. Rep. 994 (K.B. 1735). But "previous to our Revolution, and at least as early as 1770, the doctrine in England was distinctly ruled the other way, and has so stood ever since." 3 T. Waterman, A Treatise on the Principles of Law and Equity Which Govern Courts in the Granting of New Trials in Cases Civil and Criminal 1429 (1855).

Although two States declined to follow the rule in the mid-19th century, see Wright v. Illinois & Miss. Tel. Co., 20 Iowa 195, 210 (1866) ; Perry v. Bailey, 12 Kan. 539, 544-545 (1874), "most of the state courts" had already "committed themselves upon the subject," 8 Wigmore § 2354, at 702.

The bias at issue in this case was a "bias against Mexican men." App. 160. This might be described as bias based on national origin or ethnicity. Cf. Hernandez v. New York, 500 U.S. 352, 355, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion); Hernandez v. Texas, 347 U.S. 475, 479, 74 S.Ct. 667, 98 L.Ed. 866 (1954). However, no party has suggested that these distinctions make a substantive difference in this case.

As this Court has explained, the extraneous influence exception "do[es] not detract from, but rather harmonize[s] with, the weighty government interest in insulating the jury's deliberative process." Tanner, 483 U.S., at 120, 107 S.Ct. 2739. The extraneous influence exception, like the no-impeachment rule itself, is directed at protecting jury deliberations against unwarranted interference. Ibid.

In particular, the Justice Department observed that "[s]trong policy considerations continue to support" the federal approach and that "[r]ecent experience has shown that the danger of harassment of jurors by unsuccessful litigants warrants a rule which imposes strict limitations on the instances in which jurors may be questioned about their verdict." Letter from R. Kliendienst, Deputy Attorney General, to Judge A. Maris (Aug. 9, 1971), 117 Cong. Rec. 33648, 33655 (1971). And Senator McClellan, an influential member of the Senate Judiciary Committee, insisted that the "mischief in this Rule ought to be plain for all to see" and that it would be impossible "to conduct trials, particularly criminal prosecutions, as we know them today, if every verdict were followed by a post-trial hearing into the conduct of the juror's deliberations." Letter from Sen. J. McClellan to Judge A. Maris (Aug. 12, 1971), id., at 33642, 33645.

Although Warger was a civil case, we wrote that "[t]he Constitution guarantees both criminal and civil litigants a right to an impartial jury." 574 U.S., at ----, 135 S.Ct., at 528.

The majority opinion in this case identifies a fifth mechanism: jury instructions. It observes that, by explaining the jurors' responsibilities, appropriate jury instructions can promote "[p]robing and thoughtful deliberation," which in turn "improves the likelihood that other jurors can confront the flawed nature of reasoning that is prompted or influenced by improper biases." Ante, at 871. This mechanism, like those listed in Tanner, can help to prevent bias from infecting a verdict.

Both of those techniques were used in this case for other purposes. App. 13-14; Tr. 56-78 (Feb. 23, 2010, morning session).

See People v. Harlan, 8 P.3d 448, 500 (Colo.2000) ("The trial court took precautions at the outset of the trial to foreclose the injection of improper racial considerations by including questions concerning racial issues in the jury questionnaire"); Brewer v. Marshall, 119 F.3d 993, 996 (C.A.1 1997) ("The judge asked each juror, out of the presence of other jurors, whether they had any bias or prejudice for or against black persons or persons of Hispanic origin"); 6 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure § 22.3(a), p. 92 (4th ed.2015) (noting that "[j]udges commonly allow jurors to approach the bench and discuss sensitive matters there" and are also free to conduct "in chambers discussions").

See, e.g., J. Gobert, E. Kreitzberg, & C. Rose, Jury Selection: The Law, Art, and Science of Selecting a Jury § 7:41, pp. 357-358 (3d ed. 2014) (explaining that "the issue should be approached more indirectly" and suggesting the use of "[o]pen-ended questions" on subjects like "the composition of the neighborhood in which the juror lives, the juror's relationship with co-workers or neighbors of different races, or the juror's past experiences with persons of other races"); W. Jordan, Jury Selection § 8.11, p. 237 (1980) (explaining that "the whole matter of prejudice" should be approached "delicately and cautiously" and giving an example of an indirect question that avoids the word "prejudice"); R. Wenke, The Art of Selecting a Jury 67 (1979) (discussing questions that could identify biased jurors when "your client is a member of a minority group"); id., at 66 (suggesting that instead of "asking a juror if he is 'prejudiced' " the attorney should "inquire about his 'feeling,' 'belief' or 'opinion' "); 2 National Jury Project, Inc., Jurywork: Systematic Techniques § 17.23 (E. Krauss ed., 2d ed. 2010) (listing sample questions about racial prejudice); A. Grine & E. Coward, Raising Issues of Race in North Carolina Criminal Cases, p. 8-14 (2014) (suggesting that attorneys "share a brief example about a judgment shaped by a racial stereotype" to make it easier for jurors to share their own biased views), http://defendermanuals.sog.unc.edu/race/8-addressing-race-trial (as last visited Mar. 3, 2017); id., at 8-15 to 8-17 (suggesting additional strategies and providing sample questions); T. Mauet, Trial Techniques 44 (8th ed. 2010) (suggesting that "likely beliefs and attitudes are more accurately learned through indirection"); J. Lieberman & B. Sales, Scientific Jury Selection 114-115 (2007) (discussing research suggesting that "participants were more likely to admit they were unable to abide by legal due process guarantees when asked open-ended questions that did not direct their responses").

To the extent race does become salient during voir dire, there is social science research suggesting that this may actually combat rather than reinforce the jurors' biases. See, e.g., Lee, A New Approach to Voir Dire on Racial Bias, 5 U.C. Irvine L. Rev. 843, 861 (2015) ("A wealth of fairly recent empirical research has shown that when race is made salient either through pretrial publicity, voir dire questioning of prospective jurors, opening and closing arguments, or witness testimony, White jurors are more likely to treat similarly situated Black and White defendants the same way"). See also Sommers & Ellsworth, White Juror Bias: An Investigation of Prejudice Against Black Defendants in the American Courtroom, 7 Psychology, Pub. Pol'y, & L. 201, 222 (2001); Sommers & Ellsworth, How Much Do We Really Know About Race and Juries? A Review of Social Science Theory and Research, 78 Chi.-Kent L.Rev. 997, 1013-1014, 1027 (2003) ; Schuller, Kazoleas, & Kawakami, The Impact of Prejudice Screening Procedures on Racial Bias in the Courtroom, 33 Law & Human Behavior 320, 326 (2009) ; Cohn, Bucolo, Pride, & Somers, Reducing White Juror Bias: The Role of Race Salience and Racial Attitudes, 39 J. Applied Soc. Psychology 1953, 1964-1965 (2009).

It is worth noting that, even if voir dire were entirely ineffective at detecting racial bias (a proposition no one defends), that still would not suffice to distinguish this case from Warger v. Shauers, 574 U.S. ----, 135 S.Ct. 521, 190 L.Ed.2d 422 (2014). After all, the allegation in Warger was that the foreperson had entirely circumvented voir dire by lying in order to shield her bias. The Court, nevertheless, concluded that even where "jurors lie in voir dire in a way that conceals bias, juror impartiality is adequately assured" through other means. Id., at ----, 135 S.Ct., at 529.

The majority's reliance on footnote 3 of Warger, ante, at 866 - 867, is unavailing. In that footnote, the Court noted that some "cases of juror bias" might be "so extreme" as to prompt the Court to "consider whether the usual safeguards are or are not sufficient to protect the integrity of the process." 574 U.S., at 866, n. 3, 135 S.Ct., at 529, n. 3 (emphasis added). Considering this question is very different from adopting a constitutionally based exception to long-established no-impeachment rules.

In addition, those cases did not involve a challenge to a long-established evidence rule. As such, they offer little guidance in performing the analysis required by this case.

See Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

See, e.g., United States v. Armstrong, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) ; Burlington Northern R. Co. v. Ford, 504 U.S. 648, 651, 112 S.Ct. 2184, 119 L.Ed.2d 432 (1992) ; New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam ).

The majority's emphasis on the unique harms of racial bias will not succeed at cabining the novel exception to no-impeachment rules, but it may succeed at putting other kinds of rules under threat. For example, the majority approvingly refers to the widespread rules limiting attorneys' contact with jurors. Ante, at 883. But under the reasoning of the majority opinion, it is not clear why such rules should be enforced when they come into conflict with a defendant's attempt to introduce evidence of racial bias. For instance, what will happen when a lawyer obtains clear evidence of racist statements by contacting jurors in violation of a local rule? (Something similar happened in Tanner. 483 U.S., at 126, 107 S.Ct. 2739.) It remains to be seen whether rules of this type-or other rules which exclude probative evidence, such as evidentiary privileges-will be allowed to stand in the way of the "imperative to purge racial prejudice from the administration of justice." Ante, at 867.