People v Wiggins (2025 NY Slip Op 06539)

People v Jaylin Wiggins

2025 NY Slip Op 06539

Decided on November 25, 2025

Court of Appeals

Garcia, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 25, 2025

No. 99

[*1]The People & c., Respondent,
v
Jaylin Wiggins, Appellant.

Steven A. Metcalf, for appellant.
Harmony A. Healy, for respondent.

GARCIA, J.

:
On this appeal, we are asked to determine whether the trial court abused its discretion by refusing defense counsel's request for a mistrial after the court inquired into a juror's allegations that racial bias had been displayed by other jurors. On this record, we hold that the trial judge did not abuse his discretion in denying that request and we therefore affirm.
Two separate shootings involving four victims occurred in Buffalo in the early morning hours of August 4, 2016. The first took place at approximately 1 a.m. in the vicinity of Maple Street, where the victim was shot and wounded. Approximately one hour later, in the vicinity of Sherman Street, a second shooting occurred that left one dead and two others injured. Defendant was indicted on charges related to both shootings and the case went to trial.
The distinctive clothing worn by the shooter in both incidents became key evidence in the prosecution's case. Several witnesses described the shooter at both locations as dressed in a cream-colored or beige shirt with a "Burberry"-type plaid pattern and white pants. Surveillance video from the Sherman Street location showed three individuals firing weapons, but as the witness who described the video while it was being played for the jury noted, it was not possible to make out the faces of the assailants. It was, however, possible to see that the shooter positioned closest to the victim was wearing white pants and a light-colored plaid shirt. A surveillance video from Buffalo City Court showed defendant approximately twelve hours prior to the shootings wearing the same light-colored shirt with [*2]a Burberry-type plaid pattern and white pants. Testimony of a firearms examiner and the medical examiner linked the gun used to fire the fatal shot at Sherman Street to the person wearing the white pants and light-colored shirt in the video.
After deliberations began, a note from Juror 5 to the trial judge raised, among other issues, the allegation that a certain other juror, later identified as Juror 10, had displayed racial bias during deliberations. In response, the trial court individually questioned Jurors 5 and 10, afforded counsel the opportunity to inquire, and thereafter denied defense counsel's motion for a mistrial.
The jury found defendant guilty of murder in the second degree, assault in the first degree, and criminal possession of a weapon in the second degree and acquitted him of two counts of attempted murder [FN1]. Defendant moved pursuant to CPL 330.30 to set aside the verdict based on Juror 5's allegations of racial bias. The court denied the motion, holding that Juror 10 "denied making the remark in question and offered an explanation for the remark that was actually made and the possibility that the offended juror might have misinterpreted what was said." In addition, the court "expressly note[d] that the Defense did not request that either juror be removed and substituted by one of the alternate jurors."
On appeal, the Appellate Division held that the trial judge did not abuse his discretion in denying a mistrial because the court made an "appropriate inquiry into this most serious charge" of racial bias by consulting with the parties and questioning relevant jurors, which ensured that "defendant's right to an impartial verdict [was] properly balanced with the jury's right to adjudicate 'free from outside interference' " (225 AD3d 1305, 1308 [4th Dept 2024]). In reviewing the actions of the trial judge, the Court concluded that " '[i]n a probing and tactful inquiry, the [trial] court [did] evaluate the nature of what [juror No. 5] ha[d] seen, heard, or ha[d] acquired knowledge of, and assess[ed] its importance and its bearing on the case' " (id. at 1309, quoting People v Buford, 69 NY2d 290, 299 [alterations in original]). Two Justices dissented, asserting they were "unable to conclude on the record before us that the jury was not tainted by racial bias in their deliberations" (id. at 1309 [Ogden and DelConte, JJ., dissenting]). A dissenting Justice granted leave to appeal to this Court.
II.
This Court has long recognized that allegations of racial bias by a juror raise issues that go to the heart of a defendant's right to a fair trial (see e.g. People v Leonti, 262 NY 256 [1933] [uncontroverted evidence of ethnic bias expressed by juror required reversal]). Among the "several safeguards in place to protect that right," under CPL 270.35 (1), " '[i]f at any time after the trial jury has been sworn and before the rendition of its verdict . . . the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve . . . the court must discharge such juror' " and must declare a mistrial if no alternate juror is available (People v Spencer, 29 NY3d 302, 309 [2017], quoting CPL 270.35 [1]). "[A] juror is grossly unqualified" in this context "only 'when it becomes obvious that a particular juror possesses a state of mind which would prevent the rendering of an impartial verdict' " (id., quoting Buford, 69 NY2d at 298 [citation omitted]). This means for a sitting juror to be disqualified, "the record must convincingly demonstrate that [they] cannot render an impartial verdict" (id. at 310).
A trial court must be vigilant in investigating such allegations (see Buford 69 NY2d at 299)[FN2]. When "presented with some credible information indicating that a sworn juror may be grossly unqualified, [a court] must conduct a probing and tactful inquiry of the juror" (Kuzdzal, 31 NY3d at 486 [internal quotation marks and citation omitted]). We have also cautioned that it would be "unnecessary and indeed inappropriate to subject [a] juror to questions relating to her thought processes, the deliberations or other matters that lie within the confines of the jury room" (People v Sanchez, 99 NY2d 622, 623-624 [2003]). As these guidelines make clear, a trial judge's "investigation of juror misconduct or bias is a delicate and complex task, and courts must have broad flexibility in [*3]matters involving the jury" (Kuzdzal, 31 NY3d at 485 [internal quotation marks and citation omitted]). We therefore review a trial judge's decision concerning allegations of juror misconduct for abuse of discretion because "the trial judge, having the ability to continually observe the jury in court, is in the best position to devise an appropriate remedy" (id. at 485 [internal citations omitted]). Defendant did not challenge the procedure followed by the trial court in questioning the two jurors and never asserted that the questioning failed to meet the careful and tactful inquiry this Court requires, but rather claimed only that a mistrial was warranted after this inquiry was done.
It is important to place the trial court's actions in response to the allegations of racial bias in the context of the trial judge's experience with this jury. Those allegations came to the court's attention from Juror 5, who had earlier been accused by defense counsel of sleeping during the court's jury instructions. Juror 5 was questioned and denied sleeping, stating: "No. I nodded once. I was listening to you with my eyes closed. I heard you." After Juror 5 returned to the jury room, defense counsel, who had initially requested that Juror 5 be replaced by an alternate juror, said she was satisfied and "consent[ed] to allow [Juror 5] to continue to serve."
This same juror then made an allegation of racial bias in a handwritten note sent directly to the trial judge without the foreperson's signature, in violation of the court's instructions to the jury. The note read:
"Your Honor, I would like to see the video with the three men running to the car on Sherman Street. Also, I would like to hear the two closing arguments again. The other jurors do not to [sic] see or hear the evidence again. I was told the video would not show anything better. For me, I would like the screen more centered on the middle. I was told on Friday that all black people look the same in the dark. That's insulting to me, I do not want to be [bullied] into rushing my decision. Two, on Wednesday a person listening to the trial kept trying to get my attention. He kept squirming in his seat. I ignored him, then I looked him in the eyes. He did it in the morning and the afternoon. Also, the female assistant D.A. began smiling. It looked like an approval of her partner's statement Wednesday. It could make the jurors feel it is a win for the People. An officer in your court patted a city officer after the testimony. Need more stoic environment. I asked to see you on Wednesday but I was not given instructions. PS, I had taken a non-drowsy over-the-counter drug. I found it was not manufactured in the U.S.A. I bought it from Dollar Tree."

The parties and the court agreed that the note was improper, and that the jury should again be instructed that any communication had to be signed by the foreperson. The court did so, and a short time later the court received another note, this time properly signed by the foreperson and initialed by Juror 5. The note asked for certain evidence and included a statement that "I'm not going to call into question, man staring at me from gallery all day Wednesday. Another juror noticed he moved in his chair to make sure I saw him." There was no mention in this note of the earlier allegation of racial bias.
Nevertheless, defense counsel now raised that issue for the first time, claiming that she merely wanted the court to "note our exception" to "the fact there may be evidence of racial bias in our jury." The court, however, insisted that the issue needed to be promptly addressed by "bring[ing] out Juror No. 5" to "find out which juror allegedly said what she put in that note and then ask that juror about it." The parties agreed to the trial court's plan, with both parties requesting only that the inquiry avoid delving into the substance of jury deliberations.
The trial court's subsequent inquiry of the two jurors was tactful and at the same time avoided improperly intruding into the ongoing jury deliberations. The court first confirmed with Juror 5 that the comment concerning race was made during deliberations, and then had Juror 5 identify Juror 10 as the one who made it. In a somewhat confused narrative, Juror 5 then spoke at length about the person allegedly staring at her in the courtroom and claimed that Juror 10—the juror she alleged made the offending comment—noticed it as well.
The trial court afforded both parties the opportunity to inquire. The prosecutor asked Juror 5 if anything about the comment or her belief that someone was staring at her would prevent her from continuing to be a fair and impartial juror in the case, and Juror 5 answered "No." Defense counsel asked "[h]ave there been other jurors in this panel who have expressed the same sort of insulting bigotry?" Juror 5 answered "Yes," and stated that "it was a common thing, and I told them today I didn't appreciate it," but she "didn't know how far [she] wanted to go into an individual person because [she didn't] know their names." In response to a question from defense counsel about "how many of our white trial jurors have expressed this bigotry during the process?" Juror 5 responded "I would say approximately six." Juror 5 explained that other jurors had made "statements as though blacks are different . . . than [*4]white people," and she described it as an "insult to categorize everybody into this gang crime-related thing." When asked to identify the jurors who had allegedly expressed bigotry, Juror 5 responded "[t]hey changed their mind today" and that they had apologized for their statements. Defense counsel asked for "reassurance" that "the racial animus you experienced has been extinguished," and Juror 5 responded "I don't know if it's been extinguished. I cannot guarantee it, but they're aware of it, and are looking more deeper into the trial than which they would have on Friday." Juror 5 added a vague reference to some type of age bias, noting that "[t]oday was said by a younger person in the group, that's the trouble. They say, I took psychology and sociology, and they say, the trouble is you don't want these older people as jurors because they always have a benefit of the doubt kind of thought."
After this inquiry, without any questioning of Juror 10, defense counsel moved for a mistrial on the grounds that the "panel [was] impermissibly tainted with racial bias" and argued that at least six of the other jurors were incompetent to serve based on these allegations alone. Defense counsel declined to have other jurors questioned, saying it would "be impossible" and that it wouldn't "fix anything" and "[t]he only thing that would fix it is if we have a mistrial and can start over again." The trial court instead adhered to its earlier decision to question the juror who allegedly made the offending comment, now identified as Juror 10.
The court asked Juror 10 if she had in fact said that "all black people look the same in the dark." She answered, "I didn't make it in that way," explaining that she had mentioned her Asian daughter and that "you can't make an accusation on someone" based only on looks. When asked if other jurors had expressed the same sentiment; she responded, "I don't think [so]," adding that things "were trying to be rushed on Friday" and that more time was needed. When the court pressed whether such racist sentiments were expressed in the jury room, she answered, "No. Not in that manner." She also responded "[y]es" when asked by the prosecutor if she could "continue as a fair and impartial juror in this case."
When invited to question the juror, defense counsel asked how the topic came up. Juror 10 stated that another juror wanted to see the video again, and that she responded "you can't see anything on the video" because it was both taken at night and grainy. As a result, the discussion in the jury room focused on clothing rather than faces. Defense counsel confronted Juror 10 on the issue of racial bias and whether a "discussion surfaced about racial bias," and Juror 10 answered "[n]o." Defense counsel asked, "[s]omething that would smack of racial prejudice?" Juror 10 again responded with a definitive "[n]o," adding that "[t]he only thing I said was about my daughter. I would hate to be there and somebody accusing my daughter of something and they can't see her."
After Juror 10 was questioned, defense counsel again moved for a mistrial, requesting only that one remedy after having made clear that she did not want the other jurors questioned. Nor did she request that an alternate replace Juror 5 or Juror 10, although alternates remained available at this point in the trial.
As the Appellate Division noted, the trial judge "was effectively tasked with determining whether the answers elicited [from the jurors] provided evidence of racial bias potentially affecting jury deliberations or instead supported the conclusion that, following an initial rushed session, there was a frank discussion among the jurors about racial bias (and the appearance thereof) that prompted a closer look at the evidence" (225 AD3d at 1309). The mere fact that race entered the jury's deliberations does not establish that racial bias infected their verdict. Jurors discussing identification evidence—particularly the difficulty of identifying individuals in nighttime, black and white video footage—may necessarily touch upon physical characteristics including race without harboring or expressing racial animus. Here, the record indicates that the discussion at issue arose in the specific context of evaluating the crime scene surveillance video and whether the grainy nighttime footage could support any identification beyond linking the shooter's distinctive clothing to defendant.
Here, the judge was aware of the conduct of the jurors throughout the proceedings, observed the demeanor of the jurors as they were questioned on the issue of racial bias, evaluated their responses, and reasonably concluded on this record that what Juror 5 perceived as racial bias was in fact a discussion about the identification evidence, some of which, as the court noted in its post-trial decision denying the motion to set aside the verdict, may have been misinterpreted. As to the other unidentified jurors allegedly harboring some form of racial bias, defense counsel declined to request that the court question them individually (and, indeed, argued that the court should not do so), and therefore "the only asserted error preserved for appellate review was the denial of the motion for a mistrial" (People v [*5]Bailey, 32 NY3d 70, 80 [2018] [internal quotation marks and citation omitted])[FN3]. Our role is not to substitute our judgment as to the appropriate remedy for that of the trial judge. Nor, as our dissenting colleague would have it, was it Juror 5's role to "guarantee" the defendant a fair trial (see dissenting op at 2, 4, 17, 19). On review of the record here, we hold that there was no abuse of discretion in the trial court's denial of the motion for a mistrial.
Defendant's remaining arguments do not warrant reversal. His argument that the trial court erred by not reading the complete jury note into the record is unpreserved (see People v Mack, 27 NY3d 534, 541 [2016]) as is his argument that Juror 5 was grossly unqualified to serve because she was asleep during the Court's jury instructions. Finally, the Appellate Division applied the correct legal standard in conducting its weight of the evidence analysis and therefore that holding is beyond our power to review (see People v Kancharla, 23 NY3d 294, 303 [2014]).
Accordingly, the order of the Appellate Division should be affirmed.

RIVERA, J. (dissenting):

The lone person of color on defendant's jury informed the court that during deliberations, at least six jurors made racially offensive remarks, including one juror repeating a racist stereotype about Black people. When asked specifically, the juror could not guarantee that there would be no continuing racial animus among the jurors if deliberations continued. No amount of additional questioning by the court or the lawyers could make up for that lack of a guarantee. Nor could questioning of any of the other jurors about their alleged statements ensure that deliberations could continue without racial animus. The very act of questioning those jurors about their allegedly racist comments would put them on the defensive and risk exacerbating racial tensions. Moreover, if a juror denied making a racially biased statement, as was unsurprisingly the case here, then either the juror was unaware of their own bias, was being dishonest about their own statements, or another juror had misrepresented the nature of their statements to the court. What is undeniable is that here, there were uncontroverted allegations that the jury deliberations were tainted with racial tropes. Under the specific circumstances in this case, fairness demands that defendant receive a new trial on the relevant counts, before a jury focused on the evidence and not defendant's race.
I.
On the second day of deliberations in defendant's trial on charges arising from two nighttime shootings, one of which was fatal, County Court received a note directly from Juror 5 alleging that another juror made a racially offensive statement about Black people during deliberations. Juror 5 was the only person of color on an otherwise all-[*6]white jury of 12, and defendant is a Black man. During a follow-up colloquy, Juror 5 alleged that at least half of the jurors, including Juror 10, expressed racial bigotry and that she was personally insulted by their remarks. She also stated that she "confronted" the other jurors about their racist comments and "let them know [she] didn't appreciate it." The majority only cites part of the follow-up colloquy, but the full exchange shows why the only way to ensure defendant received a fair trial was to grant his request for a mistrial.
In a note, Juror 5 initially requested, among other things, that the jury rewatch a video in evidence related to the first shooting. Juror 5 wrote in the note that the other jurors thought seeing the video again would be unnecessary because, as she was told, "all [B]lack people look the same in the dark." Juror 5 indicated that this statement was personally "insulting to [her]" and that she "d[id] not want to be [bullied] into rushing [her] decision."
The note was not signed by the foreperson, as the court's instructions to the jury required. Juror 5 later explained that she did not give the note to the foreperson because she did not understand the procedure. A subsequent note from Juror 5 did not mention the racial remark. However, the court conducted an inquiry of Juror 5 outside the presence of the other jurors regarding the allegations in her original note. Initially, the court stated:
"We have a couple of questions that we'd like to ask you based upon the two notes that we received earlier today. First of all, in the note that was sent solely by you, you make reference to, and I'm quoting here from Court's Exhibit No. 5, I was told on Friday that all [B]lack people look the same in the dark. That's insulting to me. I do not want to be bullied into rushing my decision. First of all, did that take place during jury deliberations on Friday?"
Juror 5 confirmed that this exchange occurred during the first day of deliberations, and she identified Juror 10 as having made the statement. Then, the trial court inquired further:
"THE COURT: . . . [D]o you recall the words that were actually said?
JUROR 5: . . . [Y]ou know that [B]lack people all look — look the same at night. We talked about it earlier since I came back, you know."
When asked, Juror 5 answered that she could be impartial notwithstanding Juror 10's remark. However, she also stated that approximately six of the white jurors had expressed similar bigotry during the deliberations and that she could not guarantee that their racial animus had been extinguished:
"[DEFENSE COUNSEL]: . . . [Juror 5], . . . in the first note you wrote to [the] Judge . . . where you said that comment about all [B]lack people look alike at night, you also added, I find it very insulting. Have there been other jurors in this panel who have expressed the same sort of insulting bigotry?
JUROR 5: Yes. I confronted them today. We discussed it in deliberations. Yes.
[DEFENSE COUNSEL]: Can you tell me how many other of our — I'll just be bold and say it, how many of our other white trial jurors have expressed this type of bigotry?
JUROR 5: What I will say is they stopped today. And I mentioned to them because it came up. They questioned something, and I said on Friday, I — and when I came in today[,] I let them know I wrote a note. But I did not know the foreman had to sign[ ] it. That was the mistake. I misunderstood that or — because I let them know I handed in a note. So since the note and the Judge said he could not speak to me about it, we brought it up and I let them know, first thing, you know, the color about, the joke. But it wasn't a joke, is that you cannot identify anyone. And the other thing was on Friday, you know, it's determined and — it all led up to that same statement. There were a few. It was a common thing, and I told them today I didn't appreciate it. So I don't know how far I want to go into an individual person because I don't know their names, but I let them know I didn't appreciate it, and I spoke on it.
[DEFENSE COUNSEL]: Thank you. . . . [H]ow many of our white trial jurors have expressed this bigotry during the process?
JUROR 5: I'd say approximately — let me just count. I have to count what I saw in my head who was talking to me. I would say approximately six.
[THE PROSECUTOR]: Ma'am, I apologize, I don't mean to be too personal here. You mentioned though that one of the jurors said, I believe the comment was, sort of like you know all [B]lack people look the same at night. Defense counsel has thrown out the word bigotry and stuff like that. And you mentioned there were possibly six other jurors who you felt were being bigoted towards you, ma'am. What exactly have they said to you that causes you to feel that way?
JUROR 5: Well, maybe I misunderstood. You said towards me. I feel insulted that it's mentioned.
. . .
JUROR 5: One comment was directed to me.
[THE PROSECUTOR]: I don't mean to you personally. Perhaps racial comments which you deem to be bigoted. What exactly was said?
JUROR 5: Let me make it clear to you. When they made a statement as though — statements as though [B]lack[ ] [people] are different than — we live a whole different [*7]culture, whole different life, all of us, than white people. And I felt — I'm a college graduate. I taught school. I'm 65 and I worked forty-six years of my life. That's an insult to categorize everybody into this gang crime-related thing. And I'm like telling them, let's open our minds. Because you can't put us all in the same — just because we're the same color — the same bucket.
[THE PROSECUTOR]: Are you able to say specifically which jurors have said that to you? I know you mentioned the number six.
JUROR 5: They changed their mind today. Yes, at the time, but today — everybody went home and thought about the things they said and they brought it up. Wow, you know, I thought about what I said, oh. And that's what I'm even telling them. They started apologizing for things that was said. I hadn't even mentioned it to them. But I told them, yes. And then we did get into something today that a juror said. That's the trouble — so I'm trying to tell you so you get a picture of what's being said. . . .
[THE PROSECUTOR]: Ma'am, I apologize. I don't want to get too far into your deliberations because —
JUROR 5: I'm trying to give you the atmosphere. And the same person has said that, said something sort of racist on Friday. . . .
. . .
[DEFENSE COUNSEL]: Again, [Juror 5], you know . . . I heard you say there are six members of our trial panel that expressed racist[ ] sentiments to you. You said today it's different. But do you have — can you give me any reassurance that the racial animus you have experienced has been extinguished?
JUROR 5: I don't know if it's been extinguished. I cannot guarantee it, but they're aware of it, and are looking more deeper into the trial than which they would have on Friday. So . . . 
[DEFENSE COUNSEL]: Thank you. Your Honor. I have no further questions. Thank you, [Juror 5]."
After this colloquy, defense counsel moved for a mistrial on the ground that the jury was impermissibly tainted with racial bias. Defense counsel argued that six jurors had expressed racial bigotry, rendering them incompetent to serve, and that there were not enough alternates to cure the issue. Defense counsel also specifically noted:
"[Juror 5] mentioned something else that is extremely troublesome, and I wasn't going to probe because I don't want to get into jury deliberations, but she mentioned gang violence. I think we were pretty careful . . . not to get any testimony in about gangs . . . [and] that . . . suggests to me that the panel is impermissibly tainted and the likelihood that [defendant] is going to get a fair trial now is nonexistent."
The court subsequently conducted an individual inquiry of Juror 10, despite defense counsel's contention that a mistrial was the only appropriate remedy. During that colloquy, Juror 10 responded evasively, and she referred to her daughter's race while claiming that she did not make the alleged remark "in that way."
"THE COURT: . . . [Juror 10], we just had some questions about a concern that we had. One of your fellow jurors has advised the Court — that on Friday, you had expressed during jury deliberations that all [B]lack people look the same in the dark. Did you in fact make that statement?
JUROR 10: I didn't make it in that way. I said I have an Asian daughter. If somebody were to accuse her and they just — you know, by the looks, just explaining the looks of somebody, you can't make an accusation on someone like that.
THE COURT: It's also been — we've also been advised there were other jurors who during deliberations, and without getting into the deliberations themselves, expressed the same sentiment that was in the statement that we received that states all [B]lack people look the same in the dark. Were there other jurors who expressed that type of opinion?
JUROR 10: I don't think. I think it was just a matter of where they were trying to — I feel that things were trying to be rushed on Friday, and I think we should have taken more time.
THE COURT: So are you telling us that those sentiments either on Friday or today were not expressed in the jury room?
JUROR 10: No. Not in that manner.
THE COURT: Thank you. Questions of counsel?
[THE PROSECUTOR]: Ma'am, are you able to continue as a fair and impartial juror in this case?
JUROR 10: Yes.
[THE PROSECUTOR]: Thank you.
. . .
[DEFENSE COUNSEL]: When you told [the] Judge . . . they didn't say it in that way, what kind of way did they express this?
JUROR 10: I think the one juror felt things were being rushed on Friday, and I think — I'm trying to figure out how to explain it. I think there are — they were explaining how they wanted to see the video again to see — and I said, you can't see anything on the video. And that's when I think she said, well, how can you tell, I mean it's going by the clothing. It was a whole discussion on the clothing.
[DEFENSE COUNSEL]: No discussion surfaced about racial bias or —
JUROR 10: No.
[DEFENSE COUNSEL]: Something that would smack of racial prejudice?
JUROR 10: No. The only thing I said was about my daughter. I would hate to be there and somebody accusing my daughter of something and they can't see her.
[DEFENSE COUNSEL]: Thank you. I have no further questions of [Juror 10]."
Following the inquiry of Juror 10, defense counsel renewed their application for a mistrial, which County Court denied.
After the trial, defense counsel moved pursuant to CPL 330.30, alleging, as relevant here, jury misconduct. That motion noted that "[t]he jury misconduct was reported by the sole minority juror on the panel." The prosecution opposed defendant's motion, stating that "[t]he remark that was alleged to be racially insensitive was, upon closer inspection, just the opposite; the juror was cautioning her fellow jurors against relying on implicit racial bias in concluding that defendant was the shooter." County Court denied defendant's motion and reasoned that "[t]he juror denied making the remark in question and offered an explanation for the remark that was actually made and the possibility that the offended juror might have misinterpreted what was said." The court also "expressly note[d] that the [d]efense did not request that either juror be removed and substituted by one of the alternate jurors."
II.
A.
Every defendant is entitled to a fair trial (People v Arnold, 96 NY2d 358, 362 [2001]; Turner v Louisiana, 379 US 466, 471-472 [1965]). A jury tainted by racial bias cannot be impartial in its assessment of the evidence and defendant's guilt or innocence (People v Rukaj, 123 AD2d 277, 281 [1st Dept 1986] ["The scourge of racial prejudice, toward any group, which impugns a jury's ability to impartially assess the evidence, constitutes a corrupt outside influence which cannot be sustained"]; People v Leonti, 262 NY 256, 257-258 [1933] [concluding, where defendant was of Sicilian background, that a juror's statement in a post-verdict affidavit that he would never believe a Sicilian under oath, demonstrated that the juror "never was eligible to become a member of the jury, that from the beginning he was disqualified on the ground of prejudice(,) and that his vote for conviction was, therefore, a nullity"]; see also Peña-Rodriguez v Colorado, 580 US 206, 223 [2017] ["The jury is to be a criminal defendant's fundamental protection of life and liberty against race or color prejudice"] [internal quotation marks omitted]).
An allegation that even one juror harbors racial animus or espouses preconceptions about a racial group is a serious matter that requires immediate attention from the trial court (see Rukaj, 123 AD2d at 280-281; see also People v Buford, 69 NY2d 290, 298-299 [1987] [explaining that a juror must be discharged as grossly unqualified pursuant to CPL 270.35 when it is discovered during trial that they will not be able to render an impartial verdict, such as where the juror possesses actual bias, and holding that a trial court must conduct a probing and tactful inquiry of an allegedly unqualified juror to make this determination]; People v Kuzdzal, 31 NY3d 478, 486 [2018] [emphasizing that the procedure set forth in Buford applies where a trial court is "presented with some credible information (during trial) indicating that a sworn juror" has "allegedly engaged in substantial misconduct preventing the rendering of an impartial verdict"]; see generally Peña-Rodriguez, 580 US at 223-225 ["Permitting racial prejudice in the jury system damages both the fact and the perception of the jury's role as a vital check against the wrongful exercise of power by the State"] [internal quotation marks omitted]). However, given our country's history of racial discrimination and the perpetuation of racial stereotypes grounded in theories of racial inferiority, there is no easy way to talk about race (see Peña-Rodriguez, 580 US at 222-225 [describing the history of efforts to purge racial prejudice from the administration of justice in this country]; A. Leon Higginbotham, Jr., Shades of Freedom: Racial Politics and Presumptions of the American Legal Process 7-17 [1996] [discussing the development of "the precept of (B)lack inferiority and white superiority" within American legal process]). As the United States Supreme Court has noted, "[t]he stigma that attends racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations" (Peña-Rodriguez, 580 US at 225). Nonetheless, "racial bias implicates unique historical, constitutional, and institutional concerns," and "if left unaddressed, [it] risk[s] systemic injury" to the trial process and our justice system (id. at 224-225). A juror might respond to even a tactful presentation by a trial court judge with defensiveness and denial. Research shows that individuals may be unaware of how race informs their ideas and perceptions about particular racial groups, and thus unable to acknowledge internalized notions of racial inferiority (see Colin Miller, The Constitutional Right to an Implicit Bias Jury Instruction, 59 Am Crim L Rev 349, 353 [2022]). Indeed,
"research demonstrates that self-reports [of bias] are often unreliable because we may not know our implicit biases and associations or we may not choose to reveal them. This is apt to be particularly likely where self-reports are proffered on socially-sensitive topics or in stressful or ambiguous situations, situations [which are likely] to arise during jury selection and deliberation. Individuals being questioned in a court room by a judge are unlikely to lightly report matters or to answer questions in a way that could make them appear biased. The data shows us that biases very often remain undetected [*8]in this setting" (American Bar Association, Achieving an Impartial Jury (AIJ) Toolbox, at 7-9 [2017], available at https://s3.documentcloud.org/documents/3864904/Achieving-an-Impartial-Jury-Toolbox.pdf [accessed Nov. 11, 2025]).
Individuals may form unconscious associations based on race, ethnicity, and gender that lead to favorable or prejudicial attitudes towards a social group (see Miller, 59 Am Crim L Rev at 353). These associations reflect stereotypes that a racial group is intellectually or physically exceptional or inferior (see id.; Christian Sundquist, Presumed Guilty: "Illegal Alien" Evidence and the Rights of Non-Citizen Defendants, 81 NYU Ann Surv Am L 19, 36 [2025]). As the Perception Institute explains, "the term 'implicit bias' . . . describe[s] when we have attitudes towards people or associate stereotypes with them without our conscious knowledge" (Perception Institute, Implicit Bias, available at https://perception.org/research/implicit-bias/ [accessed Nov. 11, 2025]; see also New York State Unified Court System, Jury Service & Fairness, at 06:25, available at https://cmi.nycourts.gov/vod/WowzaPlayer/oca/2025-JuryFairness [accessed Nov. 11, 2025] ["(I)mplicit bias( ) (occurs) when our brains automatically attach stereotypes and feelings to groups of people without our even realizing it"]). This "implicit bias" affects human behavior and essentializes one characteristic—such as, race—as paramount above all others (see Miller, 59 Am Crim L Rev at 353; Sundquist, 81 NYU Ann Surv Am L at 36; Christian Sundquist, Uncovering Juror Racial Bias, 96 Denver L Rev 309, 336 [2019]). "Psychological research on juror decision-making has found that jurors . . . hold schemas regarding what constitutes specific crimes, as well as what offenders should look and act like[,] [and that] [t]he use of [such] schemas and stereotypical information can lead jurors to make biased or prejudiced verdict and sentencing decisions" (Sundquist, 81 NYU Ann Surv Am L at 36 [internal quotation marks and citation omitted]).
Bias renders a juror grossly unqualified (see Buford, 69 NY2d at 298-299; Rukaj, 123 AD2d at 281 ["When a juror manifests any bias or prejudice towards a defendant because of race, creed, or color, that juror is unable to return an impartial verdict . . . "]). Unlike express bias, implicit bias is more difficult to identify, but it is no less repugnant to our system of justice (see Miller, 59 Am Crim L Rev at 352-354 [explaining that the Sixth Amendment to the U.S. Constitution's guarantee of an "impartial jury" provides protection against both explicit and implicit bias]). Whether a juror states openly that they believe a defendant's racial group behaves differently from other racial or ethnic groups, or the juror unconsciously holds that same attitude, without making a conscious effort to correct for it, the possibility that the juror will act on that bias is the same (id.; see also Sundquist, 81 NYU Ann Surv Am L at 35 ["Empirical research in cognitive psychology has thoroughly demonstrated that juror decision-making is distorted by cognitive biases and other non-legal factors. The race and ethnicity of both the juror and the criminal defendant has been shown to negatively influence verdict outcomes, length of sentence, and culpability assignment"] [internal quotation marks and citations omitted]; id. at 39 ["Numerous empirical studies have found that the prevalence of racial bias in society has negatively impacted juror decision-making in criminal cases. The negative impact of racial bias on juror thought processes is due in part to the activation of cognitive schemas that rely on racialized stereotypes to associate non-white defendants—and in particular Latinx and Black defendants—with criminality"]). Reflecting this reality, "[r]esearch indicates that race bias intrudes into the jury decision-making process" (Russ K.E. Espinoza et al., The Impact of Ethnicity, Immigration Status, and Socioeconomic Status on Juror Decision Making, 13 J Ethnicity Criminal Justice 197, 198 [2015]; see also e.g. Samuel R. Sommers, Race and the Decision Making of Juries, 12 Legal Criminological Psychology 171 [2007] [literature review of research analyzing the relationship between race and jury decision-making]; Russ K.E. Espinoza & Cynthia Willis-Esqueda, Defendant and Defense Attorney Characteristics and Their Effects on Juror Decision Making and Prejudice Against Mexican Americans, 14 Cultural Diversity Ethnic Minority Psych 364, 364 [2008] ["A growing body of research examining defendant characteristics on jury decision making has demonstrated that jurors are influenced by defendants' demographic characteristics"]; Thomas W. Brewer, Race and Jurors' Receptivity to Mitigation in Capital Cases: The Effects of Jurors', Defendants', and Victims' Race in Combination, 28 Law Hum Behav 529 [Oct. 2004] [addressing the effect of race on the consideration of mitigation evidence in capital trials]).
Indeed, since the time of defendant's trial in 2018, the New York State Unified Court System (UCS) has taken numerous steps to address concerns about racial bias in jury selection and deliberation (see Chief Judge Janet [*9]DiFiore, Equal Justice in the New York State Courts: 2020-2021 Year in Review, at 4, 23-24 [2021], available at https://www.nycourts.gov/LegacyPDFS/publications/2021-Equal-Justice-Review.pdf [accessed Nov. 11, 2025] ["2021 Report"]; Jeh Charles Johnson, Report from the Special Adviser on Equal Justice in the New York State Courts, at 5, 83-84 [Oct. 2020], available at https://www.nycourts.gov/whatsnew/pdf/SpecialAdviserEqualJusticeReport.pdf [accessed Nov. 11, 2025] ["Special Adviser's Report"]). Adopting a recommendation from the Special Adviser's Report, UCS has developed and instituted "a new juror orientation video, Jury Service and Fairness," to be viewed by all potential trial jurors to educate them "about the dangers of implicit bias" (2021 Report, at 4, 23; see Special Adviser's Report, at 5, 83). The video explains "the concept of implicit bias and provides practical approaches to assist jurors with making decisions that are free from biases or stereotypes" (2021 Report, at 23). Additionally, embracing another recommendation from the Special Adviser's Report, UCS has created "mandatory instructions" on implicit bias that must "be provided to [all] trial jurors during voir dire and during preliminary and final charges" (id. at 24; see Special Adviser's Report, at 5, 83-84). "The new instructions underscore the importance of being aware of implicit biases and instruct jurors to guard against any impact those biases may have on their decision-making" (2021 Report, at 24). These measures are supported by research findings that encouraging individuals "to conform to their personal understandings of egalitarianism is correlated with a reduction in expressions of both explicit and implicit bias[,] . . . suggest[ing] that raising juror[s'] awareness of their own potential racial bias . . . may promote fairness in jury decision-making" (Sundquist, 81 NYU Ann Surv Am L at 45 [internal citations omitted]).
B.
Here, Juror 5 informed the court that Juror 10 repeated the racist stereotype that "all [B]lack people look the same in the dark." When the court asked Juror 10 if she had in fact made that statement, Juror 10's response was evasive: "I didn't make it in that way. I said I have an Asian daughter. If someone were to accuse her and they just — you know, by the looks, just explaining the looks of somebody, you can't make an accusation on someone like that." Juror 10's response acknowledged that she made a comment during deliberations that was motivated by some racial consideration, given her inexplicable reference to her daughter's race. If Juror 10 had not made the remark, she could have said so. Instead, the statement attributed to Juror 10—and, according to Juror 5, reiterated by several other jurors—indicated that those jurors were unable to impartially assess the video evidence, as they felt that they would not be able to distinguish the individuals shown in the footage given their view that "all [B]lack people look the same in the dark."
The majority's assertion that "[t]his is not a case where a juror . . . is presumed to be grossly unqualified," based on clear indications of racial bias, is curious (majority op at 5 n 2). First, County Court did not explore or confirm, despite Juror 5's allegations that six jurors had made racially biased comments, whether other members of the jury had made racially biased remarks, aside from asking Juror 10 if other jurors had expressed those "sentiments" or "opinion[s]." In response, Juror 10 stated that the comments were not made "in that manner." Asked to explain what she meant by "they didn't say it in that way," Juror 10 addressed only her own statement, explaining that it did not involve racial prejudice. As a result, the court was presented with counternarratives: Juror 5's unambiguous statements that approximately half the jury had made racially offensive comments, versus Juror 10's vague and confusing replies that were not fully responsive to the questioning about the other jurors. While Jurors 5 and 10 stated that they could remain impartial, there is no record support that the other jurors could. Under these circumstances, County Court did not adequately assess the extent of potential racial prejudice among the other white jurors and therefore could not have determined that there was no actual bias. Indeed, because of the responses that County Court received, no amount of questioning of the other jurors could ensure that deliberations could continue without racial animus. As both the prosecutor and defense counsel recognized, one by one voir dire of each juror would not have been appropriate, as the very act of questioning the jurors about the allegedly racist statements would put them on the defensive and risk exacerbating racial tensions within the jury. Indeed, the United States Supreme Court has noted that asking jurors "pointed questions" about racial bias "could well exacerbate whatever prejudice might exist without substantially aiding in exposing it" (Peña-Rodriguez, 580 US at 225-226 [internal quotation marks omitted]). Thus, under these circumstances, a mistrial was the only proper course of action.
Second, regardless of whether Juror 5 misheard or misunderstood what was said, the fact is that Juror 5, the lone person of color on defendant's jury, believed that other jurors made racially offensive statements, felt personally insulted by those statements, and spent time in the deliberations confronting her fellow jurors about the racial bias she [*10]perceived and discussing her concerns with them. When asked directly, Juror 5 stated that she could not guarantee that racial animus had been "extinguished" from the deliberations.[FN*] Put another way, even if County Court determined that Juror 5 misunderstood what Juror 10 said, the court failed to account for the fact that Juror 5 subjectively believed that Juror 10 made a statement expressing racial bias, that approximately six members of the jury made racially prejudicial remarks, and that, as a Black woman, Juror 5 was personally insulted by the other jurors' categorization of all Black people as gang members and criminals who live a whole different culture and life than white people. These are tropes about Black people historically deployed to justify discrimination and prejudicial attitudes (Cynthia J. Najdowski, How the "Black Criminal" Stereotype Shapes Black People's Psychological Experience of Policing: Evidence of Stereotype Threat and Remaining Questions, 78 Am Psych 695, 695-696 [2023]; see Sundquist, 81 NYU Ann Surv Am L at 39). Juror 5's impression that half the jury viewed all Black people—including defendant—as inferior was made clear during County Court's inquiry.
Although a juror's allegation of racial bias does not automatically require a mistrial because a court may be able to tactfully explore the basis for the juror's assertion and dispel any concerns of animus, or may have the option to replace the juror with an alternate, that was not the case here. Nothing County Court said or did could have dispelled Juror 5's perception that racial animus had pervaded the deliberations, and County Court failed to confirm whether any other juror harbored similarly biased views (see People v Chodakowski, 200 AD3d 437, 437 [1st Dept 2021] ["The court should . . . determine . . . whether the juror's statements (allegedly exhibiting ethnic bias) created a substantial risk of prejudice to the rights of the defendant by coloring the views of the other jurors . . . "] [internal quotation marks omitted]). Moreover, even if County Court had done so, alternates were not an option numerically and at this stage of deliberations.
III.
Jury deliberations can be heated and can, as the research shows, devolve into racially offensive dialogue. Often, we do not know what occurs in the jury room because of the secrecy of the deliberative process. But here, County Court was expressly confronted with what Juror 5 claimed were racially offensive statements, and during its inquiry of Juror 10 who allegedly made those remarks, she responded evasively and did not fully answer the questions asked. Moreover, according to Juror 5's uncontested statements, the jury deliberations were infected with racial stereotypes, which derailed the jurors' focus from fact finding and veered into racially inflammatory discourse. We cannot have confidence that defendant received a fair trial where approximately half of the jurors' impartiality was directly placed into question, Juror 5 could not guarantee that the white jurors' racial animus would not continue, Juror 10's responses to questioning further clouded the matter, and no adequate remedial action was available to the court that could resolve the issue.
Under the circumstances in this case, County Court abused its discretion by denying defense counsel's request for a mistrial, as there was no way that the court could allow deliberations to continue, certain that the jurors would decide the issues impartially. Therefore, I would reverse and grant defendant a new trial on the counts on which he was convicted.
I dissent.
Order affirmed. Opinion by Judge Garcia. Chief Judge Wilson and Judges Singas, Cannataro, Troutman and Halligan concur. Judge Rivera dissents in an opinion.
Decided November 25, 2025

Footnotes

Footnote 1: One count of attempted murder was voluntarily dismissed by the People at the close of the prosecution's case.

Footnote 2: This is not a case where a juror "stated unequivocally that she was racially biased" (People v Rodriguez, 71 NY2d 214, 220 [1988]) or a juror "clearly holds" such a bias "directly against the defendant" (People v Fisher, 41 NY3d 495, 501 [2024]), and therefore that juror is presumed to be grossly unqualified, making the issue one of rehabilitation. Instead, the issue for the trial judge here was whether to credit Juror 5's allegations that the other jurors were racially biased (see People v Kuzdzal, 31 NY3d 478, 485 [2018]).

Footnote 3: While defendant is limited in his argument here to the relief requested at trial, we do not suggest that the trial court is limited to the remedies requested by counsel. For example, in this case, the trial court individually questioned Juror 10 despite counsel's sole request for a mistrial.

Footnote *: It is not the case that Juror 5's role was to "guarantee" defendant a fair trial. Rather, her response that she could not guarantee that racial animus had been extinguished from the jury reflects that there was an ongoing concern that racially prejudicial beliefs were continuing to infect the deliberations. Indeed, it was the trial court's obligation to ensure, once presented with the information shared by Juror 5, that the jury would be able to impartially reach its verdict.